THE COAL RUN COAL COMPANY

*v.*

MARY JONES, Admx.

*Filed at Ottawa November 13, 1886—Re-adopted and filed January 25, 1889.*

|127|379|
|147|216|
|127|379|
|e100a¹|483|
|127|379|
|203|³600|

1. NEGLIGENCE—*dangerous occupation—known to employe.* If a workman, knowing there is danger in doing any certain kind or job of work, voluntarily undertakes to do such work, and voluntarily places himself in a known place of danger, no damages can be recovered for injuries or death occasioned thereby.

2. SAME—*of an instruction—not applicable to the facts.* In an action by the administrator of a deceased miner, against a mining company, to recover for causing the death of the intestate through negligence, it is error to instruct the jury, for the plaintiff, that it was the duty of the defendant to cause the mine to be examined every morning with a safety lamp, by a competent person, to ascertain if fire-damp was present, and to cause to be provided suitable means of signaling between the top and bottom of the mine, where such failure of duty in no way contributed to the accident which caused the death. Such an instruction has no proper application to the facts.

3. MARRIAGE—*of a second marriage—presumption in favor of its legality.* Where a man's second marriage is shown in fact, the law raises a strong presumption in favor of its legality, which is not overcome by mere proof of a prior marriage, and that the first wife is living and had not obtained a divorce. The husband may have obtained a divorce, and thus left him free to marry again.

4. INSTRUCTIONS—*complicated, confused and argumentative.* An instruction which is unnecessarily lengthy, involved, confusing, argumentative, and contains one-sided recitals of evidence, is objectionable and erroneous.

Appeal from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of La Salle county; the Hon. George W. Stipp, Judge, presiding.

Mr. Walter Reeves, and Messrs. Bull, Strawn & Ruger, for the appellant.

Messrs. Fowler Bros., and Mr. J. B. Rice, for the appellee.

Mr. Justice Sheldon delivered the opinion of the Court:

This is an appeal from a judgment of affirmance by the Appellate Court for the Second District, of a judgment for recovery of damages, in an action brought by Mary Jones, as administratrix of the estate of Thomas D. Jones, (whose widow she claims to be,) in the circuit court of La Salle county, to recover for loss in the means of support of herself and children, occasioned by the death of said Thomas D. Jones, which, she averred, was caused by the negligence of appellant, the Coal Run Coal Company.

The decedent's death occurred under the following circumstances: Appellant owned a tract of land near Streator, Illinois, upon which it sunk a shaft, some years ago, to the depth of fifty-three feet, to a stratum of coal underlying the same. This stratum of coal it worked out, and then abandoned the shaft and mine. The coal miners entered and withdrew from the mine through a slope extending from the surface to this stratum of coal. A year or two after abandoning its said shaft and mine, appellant sunk or continued the same shaft a short distance further, and struck another stratum of coal, but this second stratum proved to be unprofitable to work, and thereupon the company abandoned this new mine and the shaft or pit, and it remained abandoned for nearly a year. Appellant becoming satisfied that there was a still lower stratum of coal, resolved to sink a shaft to such lower stratum for the purpose of opening up a coal mine therein. On the 19th day of No-

vember, 1883, the work of opening the new mine in the lower stratum, a distance of about one hundred and eighty-five feet from the surface, had progressed so far, that the persons employed for that purpose had sunk the shaft down to and a short distance below this stratum, and, commencing at the bottom, had timbered the shaft up to the upper stratum, about fifty-three feet from the surface. As the shaft was being sunk, the workmen constructed a temporary partition in the center of the shaft, for the purpose of creating a circulation of air. The air coming in through the old slope, struck one side of this temporary partition fifty-three feet below the surface, passed down that side and up on the other, making a current of air around the lower end of the partition, the side down which the air passed being called the "down cast," and the other side the "up cast." There was but one partition put in for this temporary purpose, but in timbering up, two were constructed, so as to divide the shaft into three compartments,—one to be used for ventilation, and two for lowering and hoisting cages. In timbering up the shaft, it was divided into sections, and a platform erected across the shaft for the men to stand upon while doing this work, and when the permanent timbering and partitions were completed as high above the platform as the men could conveniently work therefrom, the old platform was removed, and a new platform erected higher up, and another section of the temporary partition removed. There was left a space of six inches at both ends of the platform, but the necessary removal of the temporary partition for the construction of the permanent one, cut off the circulation below the platform, for the air coming down the "down cast" would seek the first break in the partition to pass into the "up cast." The shaft was making some gas, which originated in the lower stratum of coal. This was known to the workmen, as they lighted it, and worked thereby while sinking the shaft. The accident that resulted in Jones' death occurred on the 19th of November, 1883. He had been engaged in the work of tim-

bering this shaft two days before the accident. When he commenced work, the timbering had not been completed as high up as the upper stratum, but on the morning of the accident a new platform was erected across the shaft, similar to those that had been erected below, and the men were engaged in work at this platform at the time of the accident. The platform was erected with a space of about six inches at both ends of the shaft, left for the purpose of permitting the gas that might arise from below, to pass up and out of the shaft. While at work at this platform, the old slope connected with this upper stratum was used as a "down cast," and was ample for furnishing air. The shaft above was used for the "up cast." The quantity of air was so great as to cause the miners' lighted lamps to flicker. As soon as the gas passed above the platform and came in contact with the air being supplied through the "down cast" or old slope, it became diluted and would not ignite, but below the platform it was dangerous. Jones had been at work some two or three hours, on the morning of the accident, when he tapped his lamp on the toe of his boot, and brought the flames of the lamp in contact with the gas flowing upward from beneath the platform, the result whereof was an explosion, which caused his death.

The second instruction given for the plaintiff informed the jury, among other things, that it was the duty of the defendant "to cause the said mine to be examined every morning with a safety lamp, by a competent person, to ascertain if fire-damp is present in said mine, and to cause suitable means of signaling between the top and bottom of said mine." These are requirements of section 6, chapter 93, of the Revised Statutes of 1874, and of section 4 as amended by the amendatory act of June 21, 1883, (Laws of 1883, p. 114,) the amendment requiring: "And in all mines where fire-damp is generated, every working place where such fire-damp is known to exist shall be examined every morning with a safety lamp, by a competent person, before any other persons are allowed to

enter." The point is made, that the whole subject of this legislation relates only to "opened and worked mines," and not to the sinking and completion of a shaft, which is only preparatory to the opening up and working of the mine or stratum of coal. But waiving this, and conceding that this was a mine within the meaning of the statute, there was no proper application of these statutory provisions in this case. The gas was being generated at the bottom of the shaft,—not at the "working place" where the accident occurred. This was well known, and it would have been of no use to have examined this place with a safety lamp in the morning. The men having worked at the place with their open lamps some two or three hours before the accident occurred, showed that the failure to examine the place with a safety lamp in the morning in no manner contributed to the accident, for if the safety lamp had been used, no good effect would have resulted therefrom. The proof shows that a means of signaling from the bottom to the top of the shaft was provided, but there was no person below the scaffold to signal, as there was no occasion there should be, there being no one at work below the platform. Failure to comply with these statutory provisions, we consider, in no way contributed to the accident, and the instruction, in this respect, had no proper application to the facts of the case. Its tendency was to confuse and mislead the jury, and it should not have been given.

The nineteenth instruction asked by the defendant was as follows :

"19. The jury are further instructed, that if they believe, from the evidence, that the said Thomas D. Jones, deceased, erected, or helped to erect, or had knowledge of the way in which the platform on which he stood was erected at the time the accident which resulted in his death occurred, and also had full knowledge of the fact that explosive gas was being generated below said platform in said shaft in dangerous quantity, then and in that case, if the said Jones voluntarily went upon

said platform to work, and did not ask for other material or apparatus with which to protect himself from danger, then and in that case, under the law, the said Jones took upon himself the risk of danger incurred by going onto said platform to work, and if, while so engaged at work on said platform, he lost his life by the explosion of said gas so known by him to be generating below said platform in dangerous quantity, then and in that case the defendant would not be liable for damages on account of said death, and the jury should find for the defendant, the law being, that if a workman knows there is danger in doing a certain kind or job of work, and he voluntarily undertakes to do such work, and voluntarily places himself in such danger, no damages can be recovered for injuries or death occasioned thereby."

The court added to the instruction the following modification: "But if the jury believe, from the evidence, that Jones went upon the platform of the defendant by the request of and under the employment of the defendant, and that before Jones went upon said platform, the defendant, or its agents, told and informed Jones that the shaft was safe from explosive gases, and that Jones had reason to believe that said shaft was safe, as the defendant had informed him, then the said Jones did not go upon said platform voluntarily, in the sense that word is used in the nineteenth instruction for defendant," —and, as thus modified, gave the instruction, to which the defendant excepted.

It is objected to this modification that it is not based upon any evidence in the case. Hillier, who was engaged by the company to do the work on the shaft and to employ men for the purpose, and was the man who employed Jones, testified that Jones was a man of experience as a miner, and that was the reason why he selected him; that the matter of gas was talked over between them; they knew it was making a little gas; the question with them all was to be careful not to get the lights down too low, or to get them where the gas was;

that they knew there was gas there, but didn't expect there was any more coming from there but what was passing away through the platform. And on cross-examination he said: "When Jones came to me to work we talked about the gas. He was a man that was acquainted with gas. I believe it was the night before he came to work we spoke first about this gas. Don't know that any one was present but ourselves. Were talking about gas in the shaft. He thought there would not be any danger at all, with care. I told him I thought so too." This was the only witness who testified on this subject. This being substantially all the evidence in the record of what transpired in relation to Jones' employment, we regard the objection well taken to the modification of the instruction,— that it was without basis in the evidence, and should not have been given.

The first and second instructions given for plaintiff, each one of which occupies two and a half pages of counsel's brief, are objectionable for their length, as being involved, confusing, argumentative, and containing a one-sided recital of evidence. This kind of instructions has been frequently condemned by this court.

The exclusion of the testimony of the witness Mary Evans, from the jury, is assigned for error. There was proof of the marriage of the plaintiff, Mary Jones, to Thomas D. Jones, the decedent, on February 19, 1875, in the county of LaSalle, in this State, and that she had four children by said Thomas D. Jones, as the result of the marriage. The witness Mary Evans testified that she was married to Thomas D. Jones on November 16, 1867, at Mountain Ash, in Wales; that Jones deserted her, and she subsequently married a man by the name of Evans, with whom she has since resided as his wife; that she had never been divorced from Jones, and did not know whether Jones had been divorced from her or not. This evidence was excluded. It was contended it should have been received, as showing that Mary Evans, and not the plaintiff, was the lawful widow of

Thomas D. Jones, and that the facts of this case distinguish it from *Conant* v. *Griffin*, 48 Ill. 410, where there was an attempt to show that another one than the plaintiff there was the true widow of the deceased, and it was held that which one was the true widow was immaterial; that the fact would only become important when the administrator was called upon to make distribution. It is claimed that here it is important which one is the true widow, as Mary Evans, by her conduct, had absolved the deceased from any legal liability for her support, and that she had sustained no pecuniary injury by his death. However this may be, we think the evidence was properly excluded, as not showing the invalidity of the second marriage of Jones. The second marriage being shown in fact, the law raises a strong presumption in favor of its legality, which we do not regard as overcome by mere proof of a prior marriage, and that the first wife had not obtained a divorce. (See *Johnson* v. *Johnson*, 114 Ill. 617.) The husband might have obtained such divorce and left him free to contract the second marriage.

For the errors which have been indicated, the judgments of the Appellate and circuit courts will be reversed, and the cause remanded to the circuit court.

*Judgment reversed.*

Per CURIAM: After the foregoing opinion was adopted and filed, a rehearing was granted, and the cause was under consideration when Mr. Justice SHELDON retired from the court. After a further examination of the case by the court, as now constituted, we think that the conclusion already reached is correct. The opinion of Mr. Justice SHELDON is, therefore, re-adopted, and the judgment is reversed and the cause remanded.