VIOLA A. JOHNSON v. ST. JOSEPH TERMINAL RAILWAY COMPANY and ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, Appellants.

Division One, April 11, 1907.

1. **FEDERAL JURISDICTION:** Negligence: Two Corporations: Fraudulent Joinder. The Federal court has no jurisdiction, on the theory of diverse citizenship, over a suit, by a citizen of this State for personal injuries received in this State, against two railroad companies, one a Missouri and the other a Kansas corporation, even though the foreign company allege, in its motion to transfer, that the cause of action as to it is a sep-

arable one from the one alleged against the domestic company (on whose track the injured party was working at the time he received the injuries inflicted by the foreign company's train) and that it was fraudulently joined as a defendant in an attempt to deprive it of its right to transfer the cause to the Federal court.

2. ———: **Assuming Jurisdiction After Appeal.** Where the Federal court wrongfully assumed jurisdiction after judgment in the State court and after appeal, the appellate court will dispose of the appeal as if no transcript had been filed in the Federal court.

3. **NEGLIGENCE: Contributory: Wantonness.** Where the injured party was in a place where he had a right to be and in a place where the defendant corporation had the right to expect him to be, and that place is one of imminent peril, the "humanitarian doctrine" applies, and it is not necessary either to allege or prove wantonness, recklessness or wilfulness; and even if contributory negligence is shown, plaintiff will not be denied the right to recover simply because no wantonness is shown.

4. ———: ———: **Ordinance Speed: Signal: Question for Jury.** Where the ordinance fixes a maximum speed for trains of five miles per hour and requires the bell of each locomotive engine to be rung continuously within the city limits, ordinary care does not require a trackman at work on the track to continuously look for an approaching train whose arrival is expected, but he has the right to work on and assume that those in charge of the train will obey the ordinances; and if there is evidence that they disregarded the ordinances in both respects, and evidence to the contrary, the court will not declare as a matter of law he was guilty of contributory negligence, but that question is one for the jury.

5. **MARRIAGE: Invalidity: Burden: Presumptions.** A second marriage, when shown to have been entered into according to the forms of law and to have been followed by the maintenance of marital relations, is clothed with every presumption of validity; and if its validity is drawn in question, the burden is on the attacking party, and that burden he must assume even to the proving of a negative. The presumption is not overcome by a showing that the deceased husband was previously married in due legal form to another woman, that she is still alive, that no divorce was ever granted to her knowledge, and that none was granted to him in the places where he was known to have had an established residence. The law indulges the presumption of innocence and rather than find the party guilty of bigamy will indulge the presumption of divorce. (Distinguishing Snuffer v. Karr, 197 Mo. 182, where it was admitted that there had been no dissolution of the first marriage.)

6. ———: ———: **Strained Construction.** Where the wife of the first marriage for nearly ten years lived with another man by whom she had two children, and for $100 settled with defendants for the killing of the man for whose negligent death plaintiff as his second wife sues, and claimed no more, and upon the receipt of the money agreed to and did testify, and on hearing of the death of that man married the man with whom she had been living, the facts do not invite a strained construction against the validity of the second marriage.

7. **NEGLIGENCE: Contributory: Humanitarian Doctrine: Instruction.** If the "humanitarian doctrine" applies to the case, as shown by the facts, contributory negligence is eliminated, and there is no necessity for incorporating into plaintiff's instruction designed to cover the whole case the question of whether or not the injured party was guilty of contributory negligence.

8. ———: ———: **Embraced in Defendant's Instruction.** Where plaintiff's given instruction designed to cover the whole case omits any direction to consider the question of contributory negligence, but specifically directs the jury to consider defendants' instructions as to the duties of the injured party, and in those instructions the doctrine of contributory negligence is fully set forth, it cannot be held that the case was unfairly committed to the jury, even if the question of contributory negligence is properly in the case.

9. ———: **Two Defendants: Joint Control of Train: New Point.** Where the point was not raised in the original brief, or in the trial court, that the evidence does not support the allegation that the train which inflicted the injuries on deceased was under the control of both defendants, the point was not timely raised.

10. ———: ———: ———: **Traffic Arrangements.** Where the traffic arrangement introduced in evidence amounts to a leasing of the tracks of the Missouri corporation to the foreign corporation whose train inflicted the injury, they are jointly liable. And if the servants in charge of the train were required to await the signals of the servant of the Missouri company before the train could proceed over its tracks, that is evidence that the train was under the joint control of both companies.

Appeal from Buchanan Circuit Court.—*Hon. A. M. Woodson,* Judge.

AFFIRMED.

*Gardiner Lathrop, Thomas R. Morrow, Samuel W. Moore, James P. Gilmore* and *R. A. Brown* for appellants.

(1)  A sufficient petition and bond for removal having been filed in due time by the Atchison, Topeka & Santa Fe Railway Company, it was the duty of the court below to proceed no further than to make an order of removal, and all subsequent proceedings were *coram non judice.*  Poweis v. Railroad, 169 U. S. 92; Remington v. Railroad, 198 U. S. 95; Railroad v. Daughtry, 138 U. S. 298; Railroad v. Dunn, 122 U. S. 513; Carson v. Hyatt, 118 U. S. 279; Stone v. South Carolina, 117 U. S. 430; Berry v. Railroad, 64 Mo. 553; Stanley v. Railroad, 65 Mo. 508.  (2)  It being shown to the court that a transcript of the record in the State court has been properly filed in the United States Circuit Court, and that that court had assumed jurisdiction, the trial court should now be reversed, and all proceedings herein held *coram non judice.*  City of Ashland v. Whitcomb, 129 Wis. 549; Railroad v. McMullin, 86 Wis. 597; State v. Frost, 113 Wis. 623; Robertson v. Kottrell, 69 N. H. 430; Stuart v. Bank, 57 Neb. 569; cases under point 1.  (3)  The deceased having been guilty of contributory negligence, and there being neither allegations nor proof of wantonness, willfulness or recklessness in the handling of the train in question, there can be no recovery in this case.  Evans v. Railroad, 178 Mo. 598; Sharp v. Railroad, 161 Mo. 214; Tanner v. Railroad, 161 Mo. 497; Davies v. Railroad, 159 Mo. 1.  (4)  Plaintiff having utterly failed to prove herself the lawful wife of the deceased, she is not entitled to recover in this case.  Williams v. Williams, 63 Wis. 58; Railroad v. Thorndike, 24 R. I. 105; Goodwin v. Goodwin, 113 Iowa 319; Barnes v. Barnes, 90 Iowa 232; Ellis v. Ellis, 58 Iowa 720; Gilman v. Sheets, 78 Iowa 499; Wilson v. Allen, 108 Ga. 275; Cartwright v. McGowen, 121 Ill. 388.  (5)  Even if the

case were one which should have been submitted to a jury (which we deny), plaintiff's first instruction given by the court is manifestly erroneous, and the verdict and judgment cannot stand. Evans v. Railroad, 178 Mo. 508; Davies v. Railroad, 159 Mo. 1; Nelson v. Railroad, 68 Mo. 593; Isabel v. Railroad, 60 Mo. 475; Maher v. Railroad, 64 Mo. 267; Rine v. Railroad, 88 Mo. 392; Zimmerman v. Railroad, 71 Mo. 476; Kelly v. Railroad, 11 Mo. App. 1; Keefe v. Railroad, 92 Iowa 182; Kellny v. Railroad, 101 Mo. 67; Scoville v. Railroad, 81 Mo. 434; Harlan v. Railroad, 64 Mo. 22; Morgan v. Railroad, 159 Mo. 262. (6) Plaintiff's instruction 4 was erroneous, and the verdict and judgment cannot, therefore, stand. 5 Am. and Eng. Ency. Law (2 Ed.), 30, 39 and 40; Ham v. Barrett, 28 Mo. 388; Moberly v. Railroad, 98 Mo. 183; Rapp v. Railroad, 106 Mo. 423; Meyers v. Kansas City, 108 Mo. 480; Erhart v. Dietrich, 118 Mo. 418; Bluedorn v. Railroad, 121 Mo. 258; Weller v. Railroad, 120 Mo. 635; Schepers v. Railroad, 126 Mo. 665; Payne v. Railroad, 129 Mo. 405; Morton v. Heidorn, 135 Mo. 608; Lee v. Knapp & Co., 55 Mo. App. 390; Sackberger v. Grand Lodge, 73 Mo. App. 38; Haycraft v. Grigsby, 98 Mo. App. 354; Winter v. Supreme Lodge, 96 Mo. App. 1; Oliver v. Love, 104 Mo. App. 73; Schmisser v. Beatrie, 147 Ill. 210; Murray v. Murray, 6 Ore. 18.

*Mytton, Parkinson & Crow* for respondent.

(1) The court did not err in denying the Santa Fe Company's petition to remove to the Federal Court, for the reason that the Terminal Company was liable to plaintiff for the death of her husband if the Santa Fe Company had been guilty of negligence which caused his death. Especially is this true where lessor retains possession and control of the road as here. R. S. 1899, sec. 1060; Markey v. Railroad, 185 Mo. 359;

Smith v. Railroad, 61 Mo. 17; Railroad v. Cranee, 113
U. S. 424; Heron v. Railroad, etc., 68 Minn. 542. Even
the Santa Fe Company does not deny its liability
if it was guilty of negligence, but in its peti-
tion for removal expressly asserts its liability if it
was guilty of negligence, and plaintiff having a
cause of action against the Terminal Company as well
as the Santa Fe Company, had the lawful right
to hold defendants jointly liable or sue either.
R. S. 1899, sec. 545; Railroad v. Sloan, 125 Ill. 72; Rail-
road v. Doan, 195 Ill. 168; Logan v. Railroad, 116 N. C.
940. Where the statute of the State in which the cause
of action is pending expressly authorizes the joining of
a non-resident and a resident, and makes both persons
liable for the injury, the cause is not removable. Lan-
ning v. Railroad, 94 S. W. 491; Railroad v. Thompson,
26 Mo. 161; Railroad v. Bohan, 26 Sup. Ct. Rep. 166.
(2) This case involves the principle of law
repeatedly and uniformly announced by this
court commonly known as the Humanitarian or Last
Chance Doctrine, namely, ''Where one unconscious
of a peril has negligently placed himself in a
position of danger so far away from that danger that
his death may be averted by the use of ordinary care
by those who see him and who control the dangerous
instrumentality, his death is actionable.'' We desire
to call the court's attention to recent expressions ap-
plicable to the facts in this case: Hinzman v. Railroad,
182 Mo. 611; Eppstein v. Railroad, 94 S. W. 967; Bax-
ter v. Railroad, 95 S. W. 856. (3) The deceased was
entitled to the presumption under the facts in this case
that he had obtained a divorce from his first wife, her
actions in living with a man as his wife and having two
children born while occupying that relation, holding
herself out to the world as the wife of Powell and the
deceased contracting a marriage with plaintiff openly
and in the most public manner possible and in a com-

munity where all the facts were known. Certain[1] the jury was authorized to do as it did, refuse to believe the testimony of Cora. Her life and conduct were such as to cause the jury to look upon her testimony with suspicion and especially was this true after admitting that she had received one hundred dollars from defendant. It is of course the common belief that a woman who will come into court and bastardize her offspring is unworthy of belief on any question, especially so, after she by her conduct has asserted their legitimacy for more than seven years. Klein v. Laudman, 29 Mo. 259; Johnson v. Johnson, 114 Ill. 611; Bolden v. McIntyre, 119 Ind. 574; Coalrun Coal Co. v. Jones, 127 Ill. 379; 19 Am. and Eng. Ency. Law (2 Ed.), 1208.   (4) Plaintiff's instruction 4 declared the law on the question of the validity of the marriage. Bolden v. McIntyre, 119 Ind. 574. There is no instruction on behalf of plaintiff on contributory negligence, because the issue is not in the case and was not before the court for adjudication either under the pleadings or the evidence. Johnson v. Railroad, 173 Mo. 307; Squires v. Kansas City, 100 Mo. App. 628; Morton v. Kramer, 180 Mo. 536; Chambers v. Chester, 172 Mo. 461; Perrette v. Kansas City, 162 Mo. 238; Grace v. Railroad, 156 Mo. 295.

GRAVES, J.—Plaintiff is the alleged widow of John C. B. Johnson, deceased. Petition was filed within the time allowed by statute, but as originally filed asked for but $2,000 damages. Later it was amended so as to make the *ad damnum* clause read $5,000 instead of $2,000. The action is therefore the statutory action under section 2864, Revised Statutes 1899, to recover the penal sum of $5,000, due the wife for the negligent killing of her husband.

Defendant St. Joseph Terminal Railroad Company is a Missouri corporation, and defendant Atchi-

son, Topeka & Santa Fe Railway Company is a Kansas corporation. Johnson was a section man in the employ of the Terminal Company. He was run over and killed by a Santa Fe train within the limits of the Terminal Company's switch yards in the city of St. Joseph. Defendant Santa Fe Company filed its application and bond for the removal of the cause to the U. S. Circuit Court, at St. Joseph, Mo. This application was, by the trial court, overruled. It might be well to state here that plaintiff had on February 19, 1903, brought a previous suit, which had been transferred to the Federal court, but this suit was dismissed by plaintiff in the Federal court at the September term, 1903, and the present suit brought December 14, 1903. The failure of the State court to transfer the present suit to the Federal court is urged as error. The application for removal was in due form and alleged that the cause of action, so far as the Santa Fe Company was concerned, was a separable cause of action from the one alleged against the Terminal Company, and that the Terminal Company was fraudulently joined in an attempt to deprive the Santa Fe Company of its right to transfer said cause to the Federal court.

The allegations of the petition in so far as are necessary for the opinion, are as follows:

"Plaintiff states that on or about the 18th day of December, 1902, a train of cars attached to a locomotive engine, the property of the Atchison, Topeka & Santa Fe Railway Company, passed along over the railroad tracks belonging to the Atchison, Topeka & Santa Fe Railway Company to the southern limits of St. Joseph and passed from said railroad tracks belonging to said Atchison, Topeka & Santa Fe Railway Company to the tracks of the defendant, St. Joseph Terminal Railroad Company.

"Plaintiff further states that by a traffic arrangement between said defendant companies, immediately

upon said locomotive engine and train of cars entering upon the tracks and roadway of the said Terminal Railroad Company, the servants, agents and employees in charge of said train became subject to the orders and directions of both the St. Joseph Terminal Railroad Company and the Atchison, Topeka & Santa Fe Railway Company, that said agents, servants and employees, were in the employ of the said Atchison, Topeka & Santa Fe Railway Company, but were also compelled to obey the orders and directions of the St. Joseph Terminal Railroad Company while said locomotive engine and train of cars were upon its tracks.

"Plaintiff states that after passing from the tracks of the Atchison, Topeka & Santa Fe Railway Company and onto the tracks of the St. Joseph Terminal Railroad Company the said defendants both had full, complete and absolute control of said locomotive engine and train of cars and from the time of entering the said yards of the Terminal Railroad Company said locomotive engine and train of cars was under the joint direction and control of defendants.

"Plaintiff states that under the direction and orders of the defendants Atchison, Topeka & Santa Fe Railway Company and the St. Joseph Terminal Railroad Company, said locomotive engine and train of cars passed from the southern limits of said city of St. Joseph, over and upon the tracks of the defendant, St. Joseph Terminal Railroad Company up to and north of Hickory street in said city of St. Joseph, Missouri, without sounding any whistle during all of said time or ringing any bell and at a rate of speed in excess of twenty miles per hour; and that during all of said time said locomotive engine and train of cars was within the corporate limits of the city of St. Joseph and under the joint control and direction of the defendants herein as above alleged.

"Plaintiff states that from the southern limits of

the city of St. Joseph to north of Hickory street said locomotive engine and train of cars passed over and across Hickory street and many other streets between said Hickory street and the southern limits of said city of St. Joseph, Missouri.

"Plaintiff states that it was the duty of the agents, servants and employees of defendants herein and of the companies who had control and direction of said servants to ring a bell continuously from the time said locomotive engine and train of cars entered the corporate limits of the city of St. Joseph, and to blow a whistle at the crossing of each street in said corporate limits and to not run said locomotive engine and train of cars at a rate of speed exceeding five miles per hour; that the above duty is enjoined upon defendants by section 1, of chapter 81 of the General Ordinances of the City of St. Joseph, Missouri, 1897, and section 6 of chapter 61 of said Ordinances; that it was the duty of defendants to cause their employees who were under their control and direction to obey the provisions of said ordinances above referred to. Plaintiff further states that said defendant companies failed and refused to obey the provisions of said ordinances as above set forth.

"Plaintiff further states that on the morning of the 18th day of December, 1902, a heavy snow storm producing what is commonly called a blizzard was prevailing in St. Joseph, Missouri, and about 10 o'clock on the morning of said day it became the duty of John C. B. Johnson to sweep and clean out the snow and remove the dirt from the frogs, switch junctions and roadbed of defendant St. Joseph Terminal Railroad Company in the city of St. Joseph in its yards at a point one hundred feet north of Hickory street in said city.

"Plaintiff says that prior to and at said 18th day

of December, 1902, plaintiff and John C. B. Johnson were husband and wife.

"Plaintiff states that for a distance of several hundred feet south of the point at which her said husband was at work at said time and place, the road bed and railroad tracks of the defendant companies were in a straight line and there was nothing to obstruct the view of the engineer or fireman and other employees and servants of defendants who were in charge of said locomotive engine and train of cars from seeing the position of plaintiff's said husband as he labored and worked at the place heretofore mentioned and that the agents, servants and employees of defendants who were in control and had direction of the movements of said train saw plaintiff at work upon the railroad tracks over and upon which the train was passing, or in the exercise of ordinary care, said agents, servants and employees ought to have seen him and the danger to which he was exposed by the rapid and silent approach of said locomotive engine and train of cars in time to prevent his being run over or in time for him to prevent same if he had been warned of said danger.

"Plaintiff further states that while her said husband was working on the tracks, over which said locomotive engine and train of cars were passing, as his duty required him to do, said locomotive engine and train of cars came up to him without ringing the bell or sounding the whistle and at a rate of speed not less than twenty miles per hour, ran against and over and upon plaintiff's said husband, thereby causing his instant death and on account of the condition of the weather and the failure of defendants to perform their duty as required by the ordinance hereinabove referred to, plaintiff's said husband was killed and through no fault of his own.

"Plaintiff states that the death of her said husband was caused solely by reason of the careless and

negligent manner in which said locomotive engine and train of cars were operated under the joint control and direction of the defendants herein and that by reason thereof she has been damaged in the sum of $5,000.''

Answer of the Santa Fe Company was a general denial, coupled with plea of contributory negligence and assumption of risk. That of the Terminal Company a general denial, coupled with a plea of contributory negligence. Reply, general denial. Verdict, signed by ten jurors, was for the plaintiff for $5,000, upon which judgment was entered. Motion for new trial and in arrest of judgment were filed and overruled, as was also motion for judgment for defendants notwithstanding the verdict of the jury. Thereupon an appeal was duly perfected to this court by both defendants.

Deceased was killed December 18, 1902, about ten o'clock in the morning. It was rather a cold morning and deceased was bundled up with overcoat and cap, the cap being pulled down over his ears. Considerable snow had fallen just previous to the injury, and defendant was engaged in clearing away the snow and ice from a switch in the Terminal yards. A rough plat of the situation was introduced in evidence and we make it a part of this statement, as a better idea can be gathered therefrom than from a mere bare statement.

In coming into the Union Depot at St. Joseph, the Santa Fe Company used the Rock Island track from Winthrop until the point E is reached. From E to C

is a cross-over track owned by the Santa Fe, which is likewise used. At point C the Santa Fe trains enter upon the Terminal Company's tracks and continue thereon until point A is reached. At A and from there to F is a Santa Fe cross-over, and the trains move over this cross-over to F, and from F over the Lexington branch of the. Santa Fe into Union Station. The deceased was·struck at point B, by a passenger train of three cars and an engine, the length of which train was 190 to 200 feet. This train was a passenger train and came from Topeka, Kansas, in over the Rock Island tracks, south of point E, and from point E proceeded to point C, crossing the Hannibal & St. Joe tracks at point D, and from C it proceeded north to B, the point of the accident, and on north until it was brought to a stop by reason of the accident. It was due at Union Station at 10:10 and was only three or four minutes late that morning. Union Station was something less than a mile beyond the point of accident. From E to C is 108 to 110 feet; from C to B is 520 feet; from B to A is 320 feet; from A to F is 96 feet; from C to the south line of Hickory street is 370 feet; Hickory street is 50 feet wide; from north line of Hickory street to B is 120 feet. There seems to be some few immaterial discrepancies in the foregoing distances, but they are taken from the evidence, and are nearly enough correct to answer the purposes of this statement.

North of Hickory street were two switches which were opened by a pilot, or person in the employ of the Terminal Company, whose duty it was to open and close these switches, and then board the train and accompany it to the depot, at which point the train was turned over to the pilot.

If it was proper for the train to proceed over these two switches, the pilot so signaled to the engineer of the train, and he answered the signal by two short blasts of the whistle. There was nothing to obstruct

the view of the engineer or fireman from some considerable distance below E to point B, the point of the accident.

In evidence are two sections of a city ordinance, as follows:

"Section 1.    *Rate of speed*—No locomotive engine, railroad passenger car or freight car shall be driven, propelled or run upon or along any railroad track within said city at a greater speed than the rate of five miles per hour."

"Section 6.    *Bell to be rung*—The bell of each locomotive engine shall be rung continually while running within said city."

For the plaintiff there is direct evidence that no bell was rung nor whistle sounded before the deceased was struck; that the train was running twelve to fifteen miles per hour; that the usual practice among the section men, where the train was running five miles per hour, was to leave the track when the train got within 75 or 100 feet of them; that a train of the kind which struck deceased could have been stopped within thirty feet, if running five miles per hour and within ninety feet if running fifteen miles per hour; that there was a traffic arrangement by which the Santa Fe Company used the tracks of the Terminal Company; that deceased was bending over at work at the time he was struck, or at least just a few minutes prior thereto; that when the foreman of the section men was with them he kept a lookout for trains and engines and notified the men; that it was the custom for section men to look out for themselves; that there were six or seven section men who worked at different places all over the yards.    That plaintiff was the widow of deceased.    The latter fact was testified to by plaintiff, who says she was married to Johnson August 7, 1900, by John T. Warburton at his office in the court house in St. Joseph, and the certificate of marriage intro-

duced in evidence shows the same facts and further
that Warburton was a justice of the peace. Mrs. John-
son also testified that after she was married she learn-
ed from her husband that he had been previously mar-
ried. She also testified that in the same conversation
in which he told her that he had been married, he also
told her that he had been divorced. This conversation
between the parties was brought out by defendants
upon cross-examination, and after they had brought
out a part thereof, the court permitted plaintiff to
bring out the remainder, which was the part as to a di-
vorce. Such was the plaintiff's case.

For the defendant, the evidence shows that the
whistle was sounded at the Hannibal & St. Joe cross-
ing, point D, and was again sounded just before the
train reached Hickory street, in response from the sig-
nal of the pilot; that the bell was continuously being
rung up to the time deceased was struck; that the train
was running from five to six miles per hour; that it
was the custom of the trackmen or section men to look
out for themselves and protect themselves from ap-
proaching trains and engines; that it was customary
and usual for them to continue their work until such
time as the train got within fifteen or thirty feet of
them, and then to step out of the way and let it pass;
that there was nothing to prevent the engineer from
seeing deceased; that the engineer did not see Johnson,
but the fireman saw him working at the switch on the
west side of the track just prior to the accident, but his
attention was attracted to the pilot and he, the fireman,
did not see deceased just at the time of the accident;
that the train within favorable conditions could have
been stopped within one hundred to one hundred and
twenty feet; that owing to the amount and the charac-
ter of the work the section men had to be scattered, one
or two in a place, in different parts of the yard; that
owing to his numerous duties, the foreman could not

be with all of the different men; that Johnson had worked in the yards at this time for six weeks, but was an old experienced section man; that the foreman always cautioned the men to look out for trains and switch engines; that Johnson was so cautioned the morning of the accident by the foreman when he put him to work; that Johnson had a cap drawn down over his ears. The defendant also introduced a marriage license, and a certificate of marriage, showing that the deceased had been married to Elizabeth Prather in Clay county, Missouri, July 22, 1890. This first wife was living and testified in the case under the name of Mrs. Cora Elizabeth Powell; she testified that she lived with Johnson as his wife between three and four years; that she married Powell about a year after Johnson's death, but had kept house for him and his boy for nearly ten years; that she lived in Platte county; that she had never been divorced from Johnson as far as she knew. It appeared that she had two children, one eight and the other four years of age, but she would neither admit nor deny that they were Powell's children. It also appears from the evidence that deceased Johnson was in and out of St. Joseph, and defendants account for his whereabouts for the time between 1893 or 1894, the time his first wife left him, to the date of his death, with the exception of about three years. They show that he was not divorced in Buchanan county, although he had sued his wife, Cora E., for a divorce in 1892, in that county, but dismissed the suit in November, 1892. The evidence shows that he afterwards lived with Cora E., as his wife, until the final separation a year or two later. Johnson lived in Doniphan county, Kansas, for awhile and it was shown that no divorce was granted him there.

The foregoing sufficiently states the facts. Question was raised as to the instructions and the admis-

sion of evidence, which will be noticed in the course of the opinion.

I. The defendant Santa Fe Railway Company first urges that there was error in the refusal of the trial court to transfer this cause to the Federal Circuit Court. The application and bond were timely tendered. Trial of the cause was begun February 16, 1904, and verdict returned February 24, 1904; on February 25, 1904, the day after the verdict was returned, defendant filed in the Federal court a transcript from the circuit court of Buchanan county in this cause. On March 5th an appeal was granted by the trial court to this court. On March 9th, four days after the jurisdiction was in this court, the Federal Circuit court refused to remand the cause and assumed jurisdiction thereof, and gave defendant leave to file an answer later, which answer was filed in said court July 7, 1904.

We gather these facts as to the action of the U. S. Circuit Court, from a certified transcript of its proceedings filed with the clerk of this court, and mention them, more on account of the novelty thereof, than on account of the effectiveness of such transcript. If there was error on the part of the trial court in refusing to transfer the cause, we will so determine, uninfluenced by what may have been done in the Federal court after trial and verdict, and after the jurisdiction was in this court. The doctrine of court comity seems to have been lost sight of in this cause. If we should err in our judgment as to whether the State or Federal court had jurisdiction of the cause, the Federal question is fully lodged in the case and our error can be corrected by the United States Supreme Court instead of having it determined in advance by a Federal trial court.

In our judgment there was no error in refusing to tranfer this cause. The jurisdiction is in the State

court and not in the Federal court. This much mooted question of jurisdiction has been cleared up and made plain by the Supreme Court of the United States in very recent cases, all of which are gone over and reviewed by this court In Banc in the case of Lanning v. Railroad, 196 Mo. 647, which case and the doctrine therein announced was again approved by this court In Banc, in Stotler v. Railroad, 200 Mo. 107. The exact question in this case is fully discussed in those cases, and being satisfied with the conclusion reached in them we will not add length to this opinion by a further discussion of the question. Under the authority of the Lanning and Stotler cases, supra, and the opinions of the United States Supreme Court, therein cited and discussed, we rule this point against the defendants.

II. What we have said hereinabove disposes of the second contention of the defendants, to the effect: "It being shown to the court that a transcript of the record in the State court has been properly filed in the United States Circuit Court for the St. Joseph Division of the Western District of Missouri, and that that court had assumed jurisdiction, the trial court should now be reversed, and all proceedings herein held *coram non judice*."

We hold that the trial court was right in retaining jurisdiction and the United States Circuit Court was wrong in assuming jurisdiction, so that we reach the third ground of error assigned, in words as follows:

"The deceased having been guilty of contributory negligence, and there being neither allegations nor proof of wantonness, wilfulness or recklessness in the handling of the train in question, there can be no recovery in this case."

(a) In this case where the party was in a place where he had a right to be, and in a place where defendants had a right to expect him to be, for the purpose of disposing of the latter portion of this point we can

concede the question of contributory negligence, where there is imminent peril, and the "humanitarian doctrine," now recognized by this court, applies, for it is not necessary to allege and prove wantonness, wilfulness or recklessness. This exact point has been covered in an opinion by LAMM, J., in a recent case. [White v. Railroad, 202 Mo. 539.]

(b) Was there contributory negligence shown in this case? To determine this question all the facts must be considered. It is true that deceased knew that trains and engines were likely to pass over the point where he was working at any time. But, whilst this is true, it is likewise true that, by ordinance, the bell was required to be continuously rung, and the speed of the train reduced to five miles per hour. The violation of this ordinance was negligence *per se* upon the part of the railroad company. There is no evidence that there were other moving engines close at the time, although there was a switch engine some distance north waiting for this train to pass on this particular track, so that it could use it. So as far as the evidence shows there was not the sound of a bell in or around the deceased to attract his attention. Suppose he did know of the time the train was due, yet under the evidence for the plaintiff he had a right to believe that the signal whistles would be so sounded south of Hickory street, and that a bell on the approaching engine would be continuously rung to advise him of any imminent danger. If these customary signal whistles were not sounded just south of Hickory street and the bell upon the engine was not rung, can it be said there was such contributory negligence as would authorize a peremptory instruction? Would an ordinarily careful and prudent person, expecting a train to arrive, and knowing it to be the duty of the operators of the train to run it at not exceeding five miles an hour and continuously ring the bell, be looking down the track to see if it was approaching, or

would he work on and await what he knew they would do, if they did their duty, i. e., sound the signal whistles shortly south of him, 320 feet south of him according to the evidence of the fireman, and continuously ring the bell from the city limits to the depot? Under the facts in this case we think the question of contributory negligence was one for the jury. A different question might be presented if there had been no legally fixed duty as to speed of train and ringing of the bell.

III. It is further contended that defendant, the Atchison, Topeka and Santa Fe Railway Company, was, at the time of the accident, conducting its train in the usual and ordinary manner, and if there was negligence in its manner of operating the train, deceased knew of its manner of operating such train, and thereby assumed the risk. A sufficient answer to this proposition is that such is not the evidence. It is true that the evidence for defendants showed that the whistle was sounded, the bell rung and practically the rate of speed prescribed by the ordinance maintained, and that the train was run on that day as it was ordinarily run, but plaintiff's evidence shows that it was not so run on this occasion. Citation and discussion of the many cases relied upon by defendant are unnecessary under the evidence. The cases cited have no application to the facts of this case. The evidence of the plaintiff shows an unusual and negligent (gauged by the ordinance in evidence) running of the train.

IV. Points five and seven made by the defendants will be considered together for the reason that they both attack instruction number 4 given at the instance of the plaintiff. This is the interesting question presented in this record. Instruction four reads:

"No. 4. The court instructs the jury that if you believe from the evidence that plaintiff and John C. B.

Johnson were married on the 7th day of August, 1900, you are instructed that notwithstanding the fact that John C. B. Johnson had contracted a prior marriage said last marriage was legal and valid unless you find from the evidence that the woman with whom John C B. Johnson was formerly married is alive and that no divorce was secured in this or any other State by John C. B. Johnson or the woman whom John C. B. Johnson married prior to the time of contracting the marriage with plaintiff and the burden is upon defendants to overcome the fact of marriage, if you believe there was a marriage between plaintiff and John C. B. Johnson, by proving to your satisfaction that the woman with whom John C. B. Johnson intermarried prior to his marriage with plaintiff is still alive, or that there was no divorce granted either John C. B. Johnson or the woman with whom he had contracted marriage prior to the marriage with plaintiff.''

By this instruction, when applied to the facts of this case, the defendants are required to assume the burden of proving by negative proof that there had been no dissolution by divorce, of said prior marriage. Defendants in fact assumed that burden and did prove that, in two places of residence established by deceased, no divorce had been procured and further by showing that the first wife had procured no divorce. The question, however, for us to determine, is whether or not this instruction properly places the burden of proof, and if it does, it was a question for the jury to determine whether or not the burden had been successfully carried. The cases upon this point are by no means harmonious. We start with every presumption in favor of the validity of the marriage of plaintiff and deceased. Singular to say, a case from our own court, Klein v. Laudman, 29 Mo. 259, is the basis of practically all the law cited by plaintiff in support of this instruction, and in fact the basis of several potent de-

cisions not cited by plaintiff. So that it devolves upon us to say whether that case properly declared the law, and whether or not, other courts, citing and approving it, have properly analyzed and applied the doctrine announced therein.

In the Klein case, supra, Klein and his wife had sued Laudman and wife for slander. Defendants denied the speaking of the words and in effect denied that Klein and Margaret Klein, the plaintiffs, were husband and wife. Mrs. Klein had stated that she had been previously married in Germany and these admissions were proven. Based upon that proof, the trial court gave this instruction for defendants:

"If the jury find from the evidence that the plaintiff Margaret Klein was married in Germany to another person than Leonard Klein, the plaintiff, then such relation is presumed to continue; and it devolves upon the plaintiffs to prove to the satisfaction of the jury that such marriage was legally terminated before the date of the marriage certificate, read in evidence, or they cannot recover."

In discussing this instruction, NAPTON, J., who delivered the opinion, said:

"We think the first instruction which the court gave, in this case, at the instance of the defendants, was erroneous. There was no presumption that a marriage, which was proved to have existed at one time in Germany, continued to exist here after positive proof of a second marriage de facto here. The presumption of law is, that the conduct of parties is in conformity to law, until the contrary is shown. That a fact, continuous in its nature, will be presumed to continue after its existence is once shown, is a presumption, which ought not to be allowed to overthrow another presumption, of equal if not greater force, in favor of innocence. The fact of a marriage in Germany, which was established in this case by the declar-

ation of one of the plaintiffs, was entirely consistent with the validity of the marriage *de facto,* which, beyond all dispute, existed between the parties here, and after they had produced their marriage certificate, with proof of cohabitation as husband and wife since its date, the presumption is that this marriage was a lawful one, and that the former marriage in Germany, if any such was established, had been dissolved.

"There was not any evidence in this case, so far as the bill of exceptions shows, that the first husband of Mrs. Klein was still living; but if this had been established, we think she was still entitled to the benefit of the favorable presumption that the first marriage had been dissolved by a divorce, and that it was not incumbent on her, in this character of action and under the pleadings in this case, to produce a record of the judicial or legislative proceedings by which the divorce was effected."

And on page 263, Judge Napton further said:

"There was no proof that her first husband was living; and if there had been, the woman was still entitled to the charitable presumption that a divorce from her first husband had enabled her to marry a second time. But the court directed the jury to presume the invalidity of the second marriage, unless proof positive of a dissolution of the first was produced."

In the case of Waddingham v. Waddingham, 21 Mo. App. 609, a case on the facts very much like the case at bar, as the wife was shown to have been previously married to one Charles Gavin, Ellison, J., after citing and quoting from the Klein case, supra, and speaking of the Klein case, and the one he then had under consideration, says:

"I can see no escape of plaintiff's case from the reasoning in that case. Here Charles Gavin is shown to be still alive, yet the Supreme Court maintains that so strong is the presumption of innocence as to the

second marriage proven in fact, that the law will infer the first was dissolved. So, then, if we concede all plaintiff maintains as to the sufficiency of his proof to establish a marriage between defendant and Charles Gavin, yet an actual marriage with plaintiff being conceded, the presumption in favor of defendant's innocence will raise the inference that her marriage with Gavin was dissolved.''

In the later case of Leech v. First National Bank, 99 Mo. App. l. c. 684, ELLISON, J., says:

"Ordinarily a deposit of money by a third person to the credit of another, being for his benefit, will be presumed to have been accepted by him. But this is only true of a lawful transaction. It is not true where the presumption would establish an unlawful act, or participation in an unlawful act. *For the primary presumption is always in favor of innocence.* . . . This, though things once shown to exist *are presumed to continue.* But if their continuance would develop a crime, the presumption would cease and be succeeded by one of innocence. Thus, if it be shown that a man and woman were married and lived together as husband and wife, and one of them is shown to have afterwards married another person, on a trial for bigamy the presumption of innocence will overcome the presumption of the continuance of the former marriage, and it will be assumed, in lack of other evidence, that the first marriage was, in some way, dissolved. The cases on this head are discussed in Waddingham v. Waddingham, 21 Mo. App. 628-631. And an apt illustration of the power of the presumption of innocence to overcome other presumptions is found in Klein v. Laudman, 29 Mo. 259.''

On the other hand, we have the doctrine of the Klein case criticised by the St. Louis Court of Appeals, by BARCLAY, J., in case of Winter v. Supreme Lodge Knights of Pythias, 96 Mo. App. l. c. 17, where he says:

"In a number of instances, instructions have been condemned for telling the jury in negligence cases that the law presumes every man to exercise ordinary care, or equivalent language expressing as a rule of law the idea that the conduct of an intelligent person is presumed to be in conformity to law until the contrary is shown. That rule is declared to be a 'presumption of law' in Klein v. Laudman, 29 Mo. 259. But the statement of it in the form aforesaid has been held erroneous in a number of cases, some of which we mention, more could be cited. [Palmer v. Railroad, 76 Mo. 221; Myers v. City, 108 Mo. 480; Lynch v. Railroad, 112 Mo. 420; Schepers v. Railroad, 126 Mo. 665; Nixon v. Railroad, 141 Mo. 425.] These decisions are all positive authority for the proposition that in the face of evidence permitting an inference contrary to a disputable presumption, it is not correct to throw the presumption into the scale, as it is said, in giving the law to the triers of fact.''

Outside of Missouri there are cases upholding the Klein case. One of these is the case of Hunter v. Hunter, 111 Cal. 261, 31 L. R. A. 411. In that case Mrs. Hunter had first married a man by the name of Joseph Milam in February, 1858, she being then fifteen years of age. She lived with Milam ten days when she was taken away by her parents. In July, 1862, she married Hunter and lived with Hunter for 22 years or more when Hunter brought suit to have the marriage with him declared void. In that case, TEMPLE, J., says:

"But it is said the marriage of the parties to this suit took place only about four and one-half years after the marriage to Milam, and it will be presumed that Milam was alive, in the absence of proof to the contrary. There was no proof tending to show that Milam was dead, or that his chance of life was below the average; therefore, it is contended the court should have found that he was alive. This presumption of the

continuation of life, is, however, overcome by another. It is presumed that a person is innocent of crime or wrong. [Code of Civ. Proc., sec. 1963.] There is also a presumption, and a very strong one, in favor of the legality of a marriage regularly solemnized. Rather than hold a second marriage invalid, and that the parties have committed a crime or been guilty of immorality, the courts have often indulged in the presumption of death in less than seven years, or, where the absent party was shown to be alive, have allowed a presumption that the absent party has procured a divorce. A more correct statement perhaps would be that the burden is cast upon the party asserting guilt or immorality to prove the negative—that the first marriage had not ended before the second marriage."

The latter part of the above quotation goes to the exact question raised on the instruction in this case, i. e., where is the burden of proof placed.

In Schuchart v. Schuchart, 61 Kan. 597, 50 L. R. A. 180, JOHNSTON, J., cites the Klein case with these remarks:

"The marriage in this case, as we have seen, was formally celebrated, and as every presumption of the law is in favor of matrimony, the burden is on the plaintiff to show illegality, even though it may involve the proving of a negative. To establish his case, the plaintiff was therefore required to prove, not only that Porteous was living, but that the marriage relation of the defendant with him had not been dissolved by divorce. He did show that Porteous was still living, but failed to show that a divorce had not been granted to Porteous from her. [Boulden v. McIntire, 119 Ind. 574, 21 N. E. 445; Klein v. Laudman, 29 Mo. 259; Hadley v. Rash, 21 Mont. 170, 53 Pac. 312.]"

Another case citing and quoting from the Klein case is that of Boulden v. McIntire, 119 Ind. 574, 12 Am. State Rep. 453. In this case Limes, the first hus-

band of Mrs. Boulden, was alive and at the trial. The former marriage to Limes was conceded. The second marriage was within seven years. In the Boulden case, COFFEY, J., says:

"In the absence of proof to the contrary, it would undoubtedly be presumed, in favor of the validity of her marriage with Boulden, that Limes was dead. In the absence of any showing to the contrary, what reason can be assigned, under the circumstances, for not presuming that the marriage relation between her and Limes had been dissolved by a legal divorce before her last marriage?

"It is urged that to require the appellants to prove that Eliza Street had not been divorced from Charles Limes prior to the date of her marriage with Boulden would be requiring them to prove a negative. As we have seen from the authorities above cited, the law requires the party who asserts the illegality of a marriage to take the burden of that issue and prove it, though it may involve the proving of a negative."

This case like the case from California fixes the burden of proof.

Leaving for the present those cases wherein the Klein case is cited, approved and applied, let us take up a few of the cases where the facts are somewhat similar to the case at bar, and see what the courts are holding. The first among the number is Coal Run Coal Co. v. Jones, Admrx., 127 Ill. 379, 8 N. E. 865. Mary Jones, Admrx., an alleged widow of Thomas D. Jones, brought action for the death of Jones, which occurred November 19, 1883. One Mary Evans was offered as a witness for the Coal Company. The marriage of Mary Jones to Thomas D. Jones, deceased, in La Salle county, Illinois, February 19, 1875, was practically conceded. The witness Mary Evans testified that she was married to Thomas D. Jones, November 16, 1867, in Wales; that Jones deserted her and that she subse-

quently married Evans and lived with him as his wife; that she was never divorced from Jones. This evidence was excluded. The court says:

"This evidence was excluded. It is contended it should have been received, as showing that Mary Evans, and not the plaintiff, was the lawful widow of Thomas D. Jones, and that the facts of this case distinguish it from Conant v. Griffin, 48 Ill. 410, where there was an attempt to show that another one than the plaintiff there was the true widow of deceased and it was held that which one was the true widow was immaterial; that that fact would only become important when the administrator was called upon to make distribution. It is claimed that here it is important which one is the true widow, as Mary Evans, by her conduct, had absolved the deceased from any legal liability for her support, and that she had sustained no pecuniary injury by his death. However this may be, we think the evidence was properly excluded, as not showing the invalidity of the second marriage of Jones. The second marriage being shown in fact, the law raises a strong presumption in favor of its legality, which we do not regard as overcome by mere proof of a prior marriage, and that the first wife had not obtained a divorce. [See Johnson v. Johnson, 114 Ill. 617, 3 N. E. 232.] The husband might have obtained such divorce, and left him free to contract the second marriage."

In Johnson v. Johnson, 114 Ill. 617, cited in the foregoing case, the court, per SHOPE, J., said:

"But if the law raises the presumption that the former husband was alive at the date of the last marriage, from the fact that seven years had not then elapsed since the last knowledge of him, it also, in the absence of proof to the contrary, presumes that the parties, in contracting such marriage, and in subsequently cohabiting, were innocent of immorality or crime, and

that there was no legal impediment to its consummation. When a marriage is shown in fact, the law raises a strong presumption in favor of its legality, and the burden is with the party objecting to its validity to prove that it is not valid. [Bish., Mar. & Div., secs. 457, 458.] Presumptions of this class are not conclusive, but are sufficient, in general, to shift the burden of proof. [1 Greenleaf, Ev., secs. 33-35.] These presumptions of innocence, and of the validity of the marriage, conflict with the presumption of life; and if neither presumption is aided by proof of facts or circumstances co-operating with it, the presumption of the validity of the marriage has generally been held to be the stronger, and to prevail over the presumption of the continuance of the particular life; and this is so held although the time elapsing between the last knowledge of the former husband and the second marriage is much less than seven years." ·

As to the burden of proof the doctrine is thus announced in 19 Am. and Eng. Ency. of Law (2 Ed.), 1209:

"As a result of the doctrine that all presumptions are in favor of marriage, the invalidity of a marriage cannot be established like any other question of fact, as every presumption must be overcome by satisfactory proof. The burden of proof is always on the party attacking the validity of the marriage."

And further, upon the same page, the author says: "The party having the burden of proof must overcome every presumption in favor of the marriage alleged to be invalid, even though this may require the proof of a negative."

On the question of burden of proof, even though it require the proof of a negative, the Supreme Court of the United States through Justice WAYNE, in the case of Patterson v. Gaines et ux., 6 How. l. c. 598, says: "But there is no force in this objection for

another reason.    When, in the progress of a suit in equity, a question of pedigree arises, and there is proof enough, in the opinion of the court, to establish the marriage of the ancestor, the presumption of law is, that a child of the marriage is legitimate, and it will be incumbent upon him who denies it to disprove it, though in doing so he may have to prove a negative.''

In cases of the character involved in this record, the following cases declare in favor of the presumption of divorce, although there may be evidence of a former valid marriage:  Johnson v. Johnson, 114 Ill. 611; Boulden v. McIntire, 119 Ind. 574; Blanchard v. Lambert, 43 Iowa 228; In re Edwards, 58 Iowa 431; Leach v. Hall, 95 Iowa 611; Parsons v. Grand Lodge, 108 Iowa 6; Hull v. Rawls, 27 Miss. 471; Klein v. Laudman, 29 Mo. 259; Hadley v. Rash, 21 Mont. 259; Carroll v. Carroll, 20 Tex. 731; Coal Run Coal Co. v. Jones, 127 Ill. 379; Harris v. Harris, 8 Ill. App. 57; Cartwright v. McGown, 121 Ill. 388.

Along the same line, in Hynes v. McDermott, 91 N. Y. 1. c. 459, 43 Am. Rep. 677, it is said: ''The law presumes morality, and not immorality; marriage, and not concubinage; legitimacy and not bastardy.    Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence.''

And Lord LYNDHURST in Morris v. Daviss, 5 Clark & F. 163, says: ''The presumption of law (the presumption of the validity of a marriage shown) is not lightly to be repelled.    It is not to be broken in upon or shaken by a mere balance of probability.    The evidence for the purpose of repelling it must be strong, distinct, satisfactory and conclusive.''

And Lord CAMPBELL said in Piers v. Piers, 2 H. L. Cas. 331, it could only be negatived, ''by proving every reasonable possibility.''    In Harris v. Harris, 8 Ill. App. 1. c. 63, the court says:

"When it is shown that a marriage has been consummated in accordance with the forms of the law, it is to be presumed that no legal impediments existed to their entering into matrimonial relations, and the fact, if shown, that either or both of the parties have been previously married, and, of course, at a former time having a husband or wife living, does not destroy the prima-facie legality of the last marriage. The natural inference in such case is, that the former marriage has been legally dissolved, and the burden of showing that it had not been rests upon the party seeking to impeach the last marriage. The law does not impose upon every person contracting a second marriage the necessity of preserving the evidence that the former marriage has been dissolved, either by the death of their former consort or by a decree of court, in order to protect themselves against a bill for a divorce or a prosecution for bigamy."

Along the same line fall the cases of Yates v. Houston, 3 Tex. 433; Dixon v. People, 18 Mich. 84; Greensborough v. Underhill, 12 Vt. 604.

On the other hand, there are cases against this proposition, such as Williams v. Williams, 63 Wis. 58; Rhode Island Hospital Trust Co. v. Thorndike, 24 R. I. 105; Wilson v. Allen, 108 Ga. 275. Several others are cited, but are not exactly in point.

At the argument of this cause, we are frank to state that upon this instruction number 4, we were of opinion that the trial court was in error. But an examination of the authorities has convinced us to the contrary.

Under the weight of authority, the second marriage, when shown to have been legally entered into, that is, in due form of law, is clothed with every presumption of validity. Such is the doctrine announced by Bishop. If its validity is attacked, the burden of proving the invalidity is upon the party attacking it. And if in assuming this burden, which the law demands,

it becomes necessary to prove a negative, he must do so. The law presumes death after seven years, why not presume divorce? The courts seem to look upon the presumption of innocence as the stronger and greater presumption, and in order to sustain the presumption of innocence, will indulge the presumption of divorce, rather than find the party guilty of bigamy. To say the least, the weight of judicial opinion places with the party attacking the burden of proving the invalidity of the second marriage. This is all the instruction required.

Again, the facts of the case are not specially inviting to a strained construction. The first wife for nearly ten years was living with another man, by whom she evidently had two children. She settled with defendants for $100, and hardly thought she was entitled to that sum. She made no claim to more and upon the receipt of the $100 agreed to and did testify. It is true that upon hearing of the death of Johnson, a year afterward, she married the man with whom she had been living for ten years, using the $100 paid her by defendants for that purpose.

But without going into further detail we are of opinion that there was no error upon the part of the trial court in giving said instruction. The presumption of innocence, which is stronger than all counter presumptions in such cases, casts the burden of proof upon the party denying the validity of the marriage, even to the extent of proving a negative. This in no way conflicts with the recent case of Snuffer v. Karr, 197 Mo. 182, for the reason that in the Snuffer case, it was an admitted fact that there had been no dissolution of the first marriage. The case was so argued and so presented. The validity of the first marriage was attacked, but if found to be valid, its non-dissolution was a conceded point. This being true, there was no place for presumption of divorce.

V.   Plaintiff's instruction numbered 1 is vigorously assailed by the defendants.   This instruction is as follows:

"The court instructs the jury that if they believe from the evidence that John C. B. Johnson at the time he was killed was the husband of the plaintiff, and that this suit was brought within one year after a suit was instituted against the defendants and that the suit that was dismissed was instituted against the defendants within six months after the death of John C. B. Johnson; and the jury further find from the evidence that the defendant, Atchison, Topeka & Santa Fe Railway Company, was operating a passenger train over and upon the railroad tracks and right of way of the St. Joseph Terminal Railway Company under and by virtue of a traffic arrangement or lease from said St. Joseph Terminal Railway Company; and the jury further find from the evidence that plaintiff's husband was a section hand in the employ of the St. Joseph Terminal Railway Company, and as such was engaged in the performance of his duties, on or about the track being used by, and over which said passenger train was being moved, and that the plaintiff's husband did not see said train or know of said train being operated or moved on said track at the time he was injured, and the jury further find from the evidence that the defendants were moving said train on said track at a rate of speed in excess of five miles per hour, and that said train was moving along said track towards plaintiff's said husband and that the agents and servants in charge of the operation of said train did not warn plaintiff's said husband of its approach by ringing the bell, and that said servants, agents and employees saw plaintiff's said husband on the track, or by the exercise of ordinary care could have seen him in time to have stopped said train before it struck him and thereby have avoided the injury, and did not do so, that is,

did not stop it, or that said agents, servants and employees saw plaintiff's said husband, or by the exercise of ordinary care could have seen him in time to have warned plaintiff's said husband and thereby have avoided the injury, and did not do so, that is, did not so warn him, if you believe plaintiff's said husband was injured, and that said train was being operated within the corporate limits of the city of St. Joseph, then your verdict must be for the plaintiff.

"In this connection the court instructs you that it is your duty, and you must read all the instructions in the case together, and especially is this true in regard to this instruction, and those given for the defendant stating the rights and duties of the deceased, and of the agents and servants of the defendants."

The gist of the objection is that the instruction is one covering the whole case, and leaves out the question of whether or not plaintiff's husband was, at the time, in the exercise of ordinary care and prudence, in looking out for the train, or in other words leaves out the question as to whether or not the deceased was guilty of contributory negligence.

It would have been much better for the plaintiff, upon one theory of this case, to have incorporated this element in this instruction, but upon the theory of the "humanitarian doctrine" contributory negligence is eliminated from the case, and there was no necessity of incorporating it.

But by instructions 6 and 14 given for the defendants, the doctrine of contributory negligence is fairly given, if not in other instructions given for defendants. Also in instructions 2, 4, 7, 8 and 12, modified by the court and given. From the modifications made in each of these instructions, which is in words, "without you find the facts to be as stated in instruction number one, given for plaintiff," it is evident the trial court was giving instruction number 1 on the theory of the

"humanitarian doctrine." There is ample evidence to support an instruction upon this doctrine. The evidence shows that this train could have been stopped within thirty feet, and the custom of the men was to leave the track when the train got within seventy-five or one hundred feet of them. Grant it to be true that deceased was negligent, yet the train men, under plaintiff's evidence, must have known of this custom of section men to withdraw from danger seventy-five or one hundred feet from the approaching train. If this was the custom, and the train men knew it, which they are presumed to have known, then they could have seen plaintiff's husband in a place of known and imminent danger in time to have averted it, either by stopping the train, or awakening him from his lethargy by a shrill sound of the whistle, neither of which was done. Again, the last clause of this instruction specifically directs the jury to consider defendants' instructions as to the duties of deceased.

On the whole, we think the instructions presented the case as fairly for the defendants as could be asked.

VI. In the reply brief the defendants raise for the first time the following proposition:

"Plaintiff having alleged a cause of action based upon a joint control of the servants and agents operating the train in question, must stand upon the cause of action as alleged, and will not be permitted to invoke any statements upon which the pleadings are not based, and the proof failing to show any such joint control, there was a fatal variance between the allegations and the proof, and plaintiff is not entitled to recover against either defendant."

This question was not raised in the original brief, and does not seem to have been urged in the court below. It would be a sufficient answer thereto to say that the point was not timely raised. But going beyond this, there is evidence tending to show that the train

inflicting the injury was under the joint control of both defendants. The record shows that the servants of the Santa Fe Company had to await the signal of the pilot, an employee of the Terminal Company, before they could proceed over the identical track where deceased was killed. They proceeded to pass over this track upon the signal of the Terminal Company's agent that morning.

But beyond all this, the petition charges the use of the tracks of the Terminal Company by the Santa Fe Company; it charges the fact that the former is a Missouri corporation and the latter a foreign corporation; it charges further a traffic arrangement between the two, which when introduced in evidence amounts to the leasing of the tracks of the Terminal Company, the Missouri corporation, to the Santa Fe Company, a Kansas corporation. This would make them jointly liable under our statute.

Other points made have been duly examined but not found of such character as to require specific notice here.

The only question we have had about this case was the propriety of instruction numbered 4 for plaintiff, herein above discussed. Having reached the conclusion we did upon that point, we have no hesitancy in saying that the case has been fairly tried and the judgment should be and is affirmed.

All concur, except *Woodson, J.,* not sitting.