## BARBARA MAIER, Appellant, v. T. W. BROCK et al.

### Division One, July 1, 1909.

1. **MARRIAGE: Subsequent Marriage: Presumption of Divorce.** Where a legal marriage is shown and that subsequently deceased intermarried with another woman and lived with her as his wife, the presumption of law is that the former marriage was dissolved by divorce, though the first wife is still alive and knows of no such divorce; and the burden is on her to show that there was no divorce, even though it requires the proof of a negative. In such case the presumption of innocence is stronger than the presumption that a legal marriage relation once entered into is presumed to continue.

2. ———: ———: ———: **Dower.** Plaintiff and Josef Maier were lawfully married in Germany in 1865. About fifteen months later he came to America, leaving her and an only daughter behind, and thereafter she heard from him only once until 1885, when he visited his old home in Germany and she and the daughter called upon him and he persuaded the daughter to return to America with him, but she later changed her mind, and declined to do so. He came to this State about 1872, with another wife, and lived with her in Jasper county until her death. Then in 1885 he married again and by this wife had two daughters, and she dying he married again in 1902, and of this marriage a posthumous child was born. He was always known in this country as Joseph G. Meyer. He died in 1904, and his first wife, who had always lived in Germany, sues for dower in his estate. *Held*, that the presumption of law, in view of his subsequent marriages, is that the first marriage was dissolved by a judgment for divorce in his favor, and the burden of overcoming that presumption rested upon plaintiff, though no attempt was made by defendant to show there was a divorce, and though that rule requires her to prove a negative; and having failed to show there was no divorce, she is not entitled to dower. This presumption that the first marriage was dissolved by divorce, in this case is strengthened (1) by the fact that he lived for a number of years outside of this State, and (2) by the fact that in 1885 he visited Germany and tried to induce the daughter to return to his home with him, and (3) by the fact that he was reputed an industrious, orderly and honest man in the community.

3. ———: ———: ———: **Changing Name.** Nor is the presumption weakened by the fact that after he came to America he

Maier v. Brock.

changed the spelling of his name from Josef Maier, to Joseph Meyer, for that was in fact no change of name, but at most only an Anglicizing of its spelling; and if he obtained in another State before coming to this, a divorce, on an order of publication, in the name of Joseph Meyer, the decree under the rule of *idem sonans* would have been valid as against the wife of Josef Maier.

4. ———: ———: ———: ———: **Addition of Initial.** Nor is any significance to be attached to the fact that the first wife knew him as Josef Maier and he was known in this State for thirty years as Joseph G. Meyer, since neither she nor anyone else is able to say the initial "G" was not always a part of his name.

5. **DOWER: Alien.** Since in no case is plaintiff entitled to dower, it becomes unnecessary to decide whether or not an alien is dowable in lands situate in this State owned by her husband who was also an alien; but the point is elaborately briefed by counsel.

Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs,* Judge.

AFFIRMED.

*Henry Leist* and *Thomas & Hackney* for appellant.

(1) The trial court erred in holding that a divorce between plaintiff and her husband should be presumed on account of subsequent marriages under a different name. The court erred in holding that plaintiff could not recover. The presumption of a valid marriage springing from the proof of the three marriage ceremonies performed in America is rebutted by the proof that the marriage with plaintiff is valid, that she was still living and had been true to her marital vows, and that the first marriage had not been dissolved in the jurisdiction where she lived. 8 Ency. Evidence, 464; Cole v. Cole, 153 Ill. 585; Gilman v. Sheets, 78 Iowa 499; Barnes v. Barnes, 90 Iowa 282; Ellis v. Ellis, 58 Iowa 720; Williams v. Williams, 63 Wis. 58, 89 Am. St. Rep. 206. (2) In

addition to showing that plaintiff was never divorced from her husband in Germany, that she never heard of any divorce, that she never gave him any cause for any divorce, which facts would repel the presumption that subsequent marriages were valid simply by reason of the marriage ceremony being performed, the proof showed that the delinquent husband had gone to parts unknown in America and had changed his name; and in each of his subsequent marriages and the proceedings affecting the marriages in America, he studiously concealed his true name by which he married plaintiff but used the assumed name. The fact of the changing of the name and concealing his true name would, when added to the other facts above referred to, overcome the presumption of a divorce. He was not, while in America, assuming the attitude of a free man, but was hiding his identity to escape the obligations which he had assumed when he married plaintiff. Under such circumstances there can be no presumption arising from his three subsequent marriages that he was ever divorced from plaintiff. Casley v. Mitchell, 121 Iowa 96; Cozier v. Hinchey, 143 Mo. 203; Green v. Green, 126 Mo. 17. (3) Under the statutes of the State of Missouri in force at the time that plaintiff's husband acquired this property, an alien could purchase and hold real estate in Missouri, and the wife of an alien previous to said time was held entitled to dower. Stokes v. O'Fallon, 2 Mo. 32; Green v. Green, 126 Mo. 17. An alien may take by descent. Burk v. Adams, 80 Mo. 504. And under the law as it exists in Missouri to-day, aliens shall be capable of acquiring, by devise or descent, real estate in this State, and of holding, devising or alienating the same. R. S. 1899, sec. 4762. Sec. 4764, R. S. 1899, expressly provides that the prohibition of this section shall not apply to cases in which the right to hold or dispose of lands in the United States is secured by existing treaties to the citizens or subjects of foreign countries,

which rights so far as they may exist by force of such treaties shall continue to exist as long as such treaties are in force. Article 2 of the treaty of 1844, concluded between the United States and the Kingdom of Wurtemberg (see compilation of treaties in force, prepared under Act of July 7, 1898, Washington Government Printing Office 1899, page 656), is as follows: "Where on the death of any person holding real property within the territories of one party, such real property would, by the laws of the land, descend on a citizen or subject of the other were he not disqualified by alienage, such citizen or subject shall be allowed a term of two years to sell the same—which term may be reasonably prolonged, according to circumstances—and to withdraw the proceeds thereof, without molestation and exempt from all duties of detraction." It is held in Wunderly v. Wunderly, 144 Ill. 40, that the treaty with Wurtemberg was not abrogated by the absorption of that State into the German Empire, and is, therefore, still operative; that the treaty is the law of the land superior to any law which the Legislature could pass; that like any other law its construction and application to particular questions are questions for the courts; that the clause "which term may be reasonably prolonged according to circumstances" means nothing more than that in cases where the circumstances are such as to make it reasonable that such aliens, in order to preserve their rights, should have further time in addition to the term of two years in which to sell their interest in the lands, such further time as may be reasonable under the circumstances shall be allowed; that the treaty should be construed to give it practical effect rather than to make it ineffectual; that the treaty of December 11, 1871, between the United States and the German Empire merely recognizes existing treaties between the United States and certain of the German States which became parts of the German Empire. See also:

Scharpf v. Schmidt, 172 Ill. 255; Haunstein v. Lindham, 100 U. S. 483; Wilson v. Wall, 6 Wall. 83. (4) There is no pretense in this case that Josef Maier was in fact ever divorced from plaintiff, and to require plaintiff to search the records of every court of every State in the United States and every Territorial court and the courts of Germany and other countries, to show that there was no record of such a divorce, would be without reason and would work injustice. Besides, it cannot be conceived that a man who had changed his name and was hiding his identity under an assumed name would be applying to any court for a divorce under his true name.

*McReynolds & Halliburton* for respondents.

(1) (a) Two of the marriages showing a strict compliance with the laws of Missouri, the burden is on plaintiff to prove no divorce was ever obtained by Joseph G. Meyer, and such proof must be made by evidence strong, distinct, satisfactory and conclusive. The fact that Barbara Maier had never obtained a divorce and had never heard of her husband obtaining one and that no divorce was obtained in Jasper county, Missouri, is not sufficient. Johnson v. Railroad, 203 Mo. 386; Klein v. Landman, 29 Mo. 259 (is leading case on question); Waddingham v. Waddingham, 21 Mo. App. 609; Franklin v. Lee, 62 N. E. 78. (b) ''As invalidity of marriage cannot be established like any other question of fact, as every presumption must be overcome by satisfactory proof, the burden of proof is always on the party attacking the validity of the marriage.'' Johnson v. Railroad, supra; Leech v. Bank, 99 Mo. 684; Patterson v. Gaines, 6 How. (U. S.) 550; King v. Twyning, 2 Barn. & Ald. 386; Rex v. Harborne, 2 Ad. & El. 540; 1 Bishop, Mar. & Div., sec. 547; In re Davis's Estate (Pa.), 54 Atl. 475; Franklin v. Lee, 62 N. E. 78; Railroad v. Beardsley, 79 Miss.

417; Senge v. Senge, 106 Ill. App. 140. (c) Every intendment of the law favors matrimony. As is often said, the law presumes morality, not immorality; marriage, not concubinage; legitimacy, not bastardy. When a marriage in fact has been shown, the law raises a presumption that it is valid and casts the burden on him who questions it to establish its invalidity. This is a presumption of more than ordinary strength. It is one of the strongest known to the law. Pittinger v. Pittinger (Colo.), 89 Am. St. Rep. 193; Lampkin v. Traveler's Ins. Co., 11 Colo. App. 249; 2 Nelson on Divorce and Separation, sec. 580; Teter v. Teter, 101 Ind. 129; Johnson v. Johnson, 114 Ill. 611; Erwin v. English, 61 Conn. 502; U. S. v. Amador (N. M.), 27 Pac. 488; Holbrook v. State, 34 Ark. 511; Cooper v. Cooper, 86 Ind. 75; Franklin v. Lee (Ind.), 62 N. E. 78; LeBrun v. LeBrun, 55 Md. 496; Senser v. Bower, 1 P. & W. 450; Thomas v. Thomas (Pa.), 17 Atl. 182. (d) If it is shown that a party to a marriage has contracted a previous marriage and that his or her former spouse is still living, this has been held not to destroy the prima-facie validity of the second marriage. In such cases it has been presumed that the first marriage has been dissolved by divorce, and the burden to show that it has not rests on the person seeking to impeach the last marriage, notwithstanding he is thereby required to prove a negative. Here the presumption of the continuance of the first marriage is made to yield to the presumption in favor of the validity of the second marriage and of the innocence of the parties to it. Pittinger v. Pittinger, supra; Erwin v. English, 61 Conn. 502; Schmisseur v. Beatrie (Ill.), 35 N. E. 525; Winning v. Teeple (Ind.), 41 N. E. 600; Tuttle v. Raish (Iowa), 90 N. W. 66; Railroad v. Beardsley, 79 Miss. 417; Hadley v. Rash, 69 Am. St. 649; Goldwater v. Burnside (Wash.), 60 Pac. 409; Bull v. Bull (Tex.), 68 S. W. 727; Johnson v. Railroad, supra. (2) (a) The fact that Barbara

Maier never resided in the United States, even though her husband may have been a naturalized citizen of this country, makes her an alien. Secretary Olney, Opinion, Senate Document No. 83, 1st Session, 54th Congress; Ruckgaber v. Moore, 104 Fed. 947; Pequigirst v. Detroit, 16 Fed. 211; Comitis v. Parkerson, 56 Fed. 556; Citizenship in the United States (Van Dyne), chap. 3, title "Naturalization by Marriage," pp. 139-142; U. S. Marshal v. Fanchant, 65 C. C. A. 1, 130 Fed. 839. (b) An alien widow is not entitled to dower under the common law, even though her husband was a natural born or naturalized citizen. Scribner on Dower, pp. 151, 152, secs. 3, 4; 2 Bishop, Married Women, secs. 506-510; Alsberry v. Hawkins (Ky.), 33 Am. Dec. 546; Shanks v. Dupont, 3 Pet. (U. S.) 242. (c) Stokes v. O'Fallon, 2 Mo. 32, was relied upon by appellant in the lower court. The act upon which the Stokes Case is bottomed is not in force since Missouri became a State, and there was no such provision in our statute of Descents and Distributions at the time of Meyer's death, the law in force at that date governing. Carey v. West, 139 Mo. 174; Pilla v. German School Assn., 23 Fed. 700. (d) It is claimed in the lower court that the domicile of the wife followed the domicile of the husband. Under the facts in this case no such rule applies. Gallagher v. Delargy, 57 Mo. 36; 2 Kent's Commentaries, p. 154; Rose v. Bates, 12 Mo. 30; Huffer v. Riley, 47 Mo. App. 181. (e) Appellant Barbara Maier acquired no rights under the treaty between Germany and the United States. Wunderlee v. Wunderlee (Ill.), 33 N. E. 195; In re Stobel's Estate, 5 App. Div. 621. (f) Foreigners by birth are prima-facie aliens. White v. White, 59 Ky. 185. (g) In the absence of proof that an alien has become a citizen of the United States, his original status is presumed to continue. Havenstein v. Lynham, 100 U. S. 483.

WOODSON, J.—The plaintiff brought this suit for the assignment of dower, in the circuit court of Jasper county.

The petition was in the usual form. The answer was a general denial, and a plea that plaintiff was an alien, a resident of Germany, and had never resided in this country. The reply was a general denial of the new matter contained in the answer.

The evidence showed that plaintiff was married to one Josef Maier on January 24, 1865, in the Empire of Germany, and that they lived together as man and wife until the spring of 1866, when he left her and came to the United States. Shortly after he reached this country she heard from him once, but no more until the year 1885, when he visited his old home in Germany, when she went to see him, and there saw him for the last time. He was known in this country by the name of Joseph G. Meyer. She never knew of his using any other name than that of Josef Maier, and heard of his death, in Carthage, Missouri, through a report of a life insurance company which had issued a policy on his life.

There was considerable evidence introduced tending to show that Josef Maier and Joseph G. Meyer were one and the same person, but as there is practically no dispute but what they were one and the same person, it would be useless to burden this statement with a copy of that evidence. Plaintiff never remarried and remained true to her marital vows.

Joseph G. Meyer died in Jasper county, February 3, 1904, seized of the real estate described in the petition. He went to that county sometime between the year 1872 and 1874, and took with him a second wife, who lived with him on this farm until her death. On March 12, 1885, he married Marie Balduff, in the city of St. Louis, and lived with her on this land until her death. Of that marriage two daughters were born,

222 Sup— 6

who were grown young ladies at the time of the trial of this cause. He then married a woman by the name of Cumberledge, from whom he was divorced; and subsequent thereto, on January 17, 1902, he married Nora Carl, of Jasper county, and lived with her until his death; and of which marriage a posthumous child was born.

No one in this country ever heard of his having been married in Germany until this suit was brought. Meyer was a German-born citizen and had never applied for naturalization in Jasper county. This record shows that he had been an industrious, hard-working, good citizen while he lived in this State, but it fails to show where he lived from the time he came to this country, in 1866, up to the time he went to Jasper county.

No instructions were asked or given.

The court found for the defendants, and plaintiff appealed.

I. There can be no serious question, in the light of the evidence preserved in this record, but what Joseph G. Meyer, mentioned in the evidence, was one and the same person, who married the appellant in Germany in the year 1865, under the name of Josef Maier; nor can there be any question but what he was married at least three times subsequent to his coming to this State, and presumably once before that date.

Upon these facts rests the main legal proposition involved in this case. Counsel for respondents contend that the subsequent marriages in this country raised a presumption that Joseph G. Meyer was divorced from appellant after coming to this country and prior to his said marriages in this State.

This question has been so recently and so ably discussed by Judge GRAVES, in the case of Johnson v. Railroad, 203 Mo. 381, I feel it would be a useless waste

of time for me to do more than quote from his opinion what he said upon this question. The question involved in this case is identical with the one which was involved there. On page 402 he uses this language:

"By this instruction, when applied to the facts of this case, the defendants are required to assume the burden of proving by negative proof that there had been no dissolution by divorce, of said prior marriage. Defendants in fact assumed that burden and did prove that, in two places of residence established by deceased, no divorce had been procured, and further by showing that the first wife had procured no divorce. The question, however, for us to determine, is whether or not this instruction properly places the burden of proof, and if it does, it was a question for the jury to determine whether or not the burden had been successfully carried. The cases upon this point are by no means harmonious. We start with every presumption in favor of the validity of the marriage of plaintiff and deceased. Singular to say, a case from our own court, Klein v. Laudman, 29 Mo. 259, is the basis of practically all the law cited by plaintiff in support of this instruction, and in fact the basis of several potent decisions not cited by plaintiff. So that it devolves upon us to say whether that case properly declared the law, and whether or not other courts, citing and approving it, have properly analyzed and applied the doctrine announced therein.

"In the Klein case, supra, Klein and his wife had sued Laudman and wife for slander. Defendants denied the speaking of the words and in effect denied that Klein and Margaret Klein, the plaintiffs, were husband and wife. Mrs. Klein had stated that she had been previously married in Germany and these admissions were proven. Based upon that proof, the trial court gave this instruction for defendants:

" 'If the jury find from the evidence that the plaintiff Margaret Klein was married in Germany to another person than Leonard Klein, the plaintiff, then such relation is presumed to continue; and it devolves upon the plaintiffs to prove to the satisfaction of the jury that such marriage was legally terminated before the date of the marriage certificate, read in evidence, or they cannot recover.'

"In discussing this instruction, NAPTON, J., who delivered the opinion, said: 'We think the first instruction which the court gave, in this case, at the instance of the defendants, was erroneous. There.was no presumption that a marriage, which was proved to have existed at one time in Germany, continued to exist here after positive proof of a second marriage de facto here. The presumption of law is, that the conduct of parties is in conformity to law, until the contrary is shown. That a fact, continuous in its nature, will be presumed to continue after its existence is once shown, is a presumption, which ought not to be allowed to overthrow another presumption of equal if not greater force, in favor of innocence. The fact of a marriage in Germany, which was established in this case by the declaration of one of the plaintiffs, was entirely consistent with the validity of the marriage de facto, which, beyond all dispute, existed between the parties here, and after they had produced their marriage certificate, with proof of cohabitation as husband and wife since its date, the presumption is that this marriage was a lawful one, and that the former marriage in Germany, if any such was established, had been dissolved. There was not any evidence in this case, so far as the bill of exceptions shows, that the first husband of Mrs. Klein was still living; but if this had been established, we think she was still entitled to the benefit of the favorable presumption that the first marriage had been dissolved by a divorce, and that it was not incumbent on her,

in this character of action and under the pleadings in this case, to produce a record of the judicial or legislative proceedings by which the divorce was effected.'

"And on page 263, Judge NAPTON further said: 'There was no proof that her first husband was living; and if there has been, the woman was still entitled to the charitable presumption that a divorce from her first husband had enabled her to marry a second time. But the court directed the jury to presume the invalidity of the second marriage, unless proof positive of a dissolution of the first was produced.'

"In the case of Waddingham v. Waddingham, 21 Mo. App. 609, a case on the facts very much like the case at bar, as the wife was shown to have been previously married to one Charles Gavin, ELLISON, J., after citing and quoting from the Klein Case, supra, and speaking of the Klein Case, and the one he then had under consideration, says: 'I can see no escape of plaintiff's case from the reasoning in that case. Here Charles Gavin is shown to be still alive, yet the Supreme Court maintains that so strong is the presumption of innocence as to the second marriage proven in fact, that the law will infer the first was dissolved. So, then, if we concede all plaintiff maintains as to the sufficiency of his proof to establish a marriage between defendant and Charles Gavin, yet an actual marriage with plaintiff being conceded, the presumption in favor of defendant's innocence will raise the inference that her marriage with Gavin was dissolved.'

"In the later case of Leech v. First National Bank, 99 Mo. App. l. c. 684, ELLISON, J., says: 'Ordinarily a deposit of money by a third person to the credit of another being for his benefit, will be presumed to have been accepted by him. But this is only true of a lawful transaction. It is not true where the presumption would establish an unlawful act, or participation in an unlawful act. For the primary

presumption is always in favor of innocence. . . . This, though things once shown to exist are presumed to continue. But if their continuance would develop a crime, the presumption would cease and be succeeded by one of innocence. Thus, if it be shown that a man and. woman were married and lived together as husband and wife, and one of them is shown to have afterwards married another person, on a trial of bigamy, the presumption of innocence will overcome the presumption of the continuance of the former marriage, and it will be assumed, in lack of other evidence, that the first marriage was, in some way, dissolved. The cases on this head are discussed in Waddingham v. Waddingham, 21 Mo. App. 628-631. And an apt illustration of the power of the presumption of innocence to overcome other presumptions is found in Klein v. Laudman, 29 Mo. 259.'

"On the other hand, we have the doctrine of the Klein case criticised by the St. Louis Court of Appeals, by BARCLAY, J., in case of Winter v. Supreme Lodge Knights of Pythias, 96 Mo. App. l. c. 17, where he says: 'In a number of instances, instructions have been condemned for telling the jury in negligence cases that the law presumes every man to exercise ordinary care, or equivalent language expressing as a rule of law the idea that the conduct of an intelligent person is presumed to be in conformity to the law until the contrary is shown. That rule is declared to be a "presumption of law" in Klein v. Laudman, 29 Mo. 259. But the statement of it in the form aforesaid has been held erroneous in a number of cases, some of which we mentioned, more could be cited. [Palmer v. Railroad, 76 Mo. 221; Myers v. City, 108 Mo. 480; Lynch v. Railroad, 112 Mo. 420; Schepers v. Railroad, 126 Mo. 665; Nixon v. Railroad, 141 Mo. 425.] These decisions are all positive authority for the proposition that in the face of evidence permitting an inference

contrary to a disputable presumption, it is not correct to throw the presumption into the scale, as it is said, in giving the law to the triers of fact.'

"Outside of Missouri there are cases upholding the Klein case. One of these is the case of Hunter v. Hunter, 111 Cal. 261, 31 L. R. A. 411. In that case Mrs. Hunter had first married a man by the name of Joseph Milam in February, 1858, she being then fifteen years of age. She lived with Milam ten days, when she was taken away by her parents. In July, 1862, she married Hunter and lived with Hunter for twenty-two years or more, when Hunter brought suit to have the marriage with him declared void. In that case, TEMPLE, J., says: 'But it is said the marriage of the parties to this suit took place only about four and one-half years after the marriage to Milam, and it will be presumed that Milam was alive, in the absence of proof to the contrary. There was no proof tending to show that Milam was dead, or that his chance of life was below the average; therefore, it is contended the court should have found that he was alive. This presumption of the continuation of life is, however, overcome by another. It is presumed that a person is innocent of crime or wrong. [Code of Civ. Proc., sec. 1963.] There is also a presumption, and a very strong one, in favor of the legality of a marriage regularly solemnized. Rather than hold a second marriage invalid, and that the parties have committed a crime or been guilty of immorality, the courts have often indulged in the presumption of death in less than seven years, or, where the absent party was shown to be alive, have allowed a presumption that the absent party has procured a divorce. A more correct statement perhaps would be that the burden is cast upon the party asserting guilt or immorality to prove the negative—that the first marriage had not ended before the second marriage.'

"The latter part of the above quotation goes to the exact question raised on the instruction in this case, *i.e.,* where is the burden of proof placed?

"In Schuchart v. Schuchart, 61 Kan. 597, 50 L. R. A. 180, JOHNSON, J., cites the Klein case with these remarks: 'The marriage in this case, as we have seen, was formally celebrated and as every presumption of the law is in favor of matrimony, the burden is on the plaintiff to show illegality, even though it may involve the proving of a negative. To establish his case, the plaintiff was therefore required to prove, not only that Porteous was living, but that the marriage relation of the defendant with him had not been dissolved by divorce. He did show that Porteous was still living, but failed to show that a divorce had not been granted to Porteous from her. [Boulden v. McIntire, 119 Ind. 574, 21 N. E. 445; Klein v. Laudman, 29 Mo. 259; Hadley v. Rash, 21 Mont. 170, 53 Pac. 312.]'

"Another case citing and quoting from the Klein case is that of Boulden v. McIntire, 119 Ind. 574, 12 Am. St. Rep. 453. In this case Limes, the first husband of Mrs. Boulden, was alive and at the trial. The former marriage to Limes was conceded. The second marriage was within seven years. In the Boulden case, COFFEY, J., says: 'In the absence of proof to the contrary, it would undoubtedly be presumed, in favor of the validity of her marriage with Boulden, that Limes was dead. In the absence of any showing to the contrary, what reason can be assigned, under the circumstances, for not presuming that the marriage relation between her and Limes had been dissolved by a legal divorce before her last marriage? It is urged that to require the appellants to prove that Eliza Street had not been divorced from Charles Limes prior to the date of her marriage with Boulden would be requiring them to prove a negative. As we have seen from the authorities above cited, the law requires

the party who asserts the illegality of a marriage to take the burden of that issue and prove it, though it may involve the proving of a negative.'

"This case like the case from California fixes the burden of proof.

"Leaving for the present those cases wherein the Klein case is cited, approved and applied, let us take up a few cases where the facts are somewhat similar to the case at bar, and see what the courts are holding. The first among the number is Coal Run Coal Co. v. Jones, Admrx., 127 Ill. 379, 8 N. E. 865. Mary Jones, Admrx., an alleged widow of Thomas D. Jones, brought action for the death of Jones, which occurred November 19, 1883. One Mary Evans was offered as a witness for the coal company. The marriage of Mary Jones to Thomas D. Jones, deceased, in LaSalle county, Illinois, February 19, 1875, was practically conceded. The witness Mary Evans testified that she was married to Thomas D. Jones, November 16, 1867, in Wales; that Jones deserted her and that she subsequently married Evans and lived with him as his wife; that she was never divorced from Jones. This evidence was excluded. The court says: 'This evidence was excluded. It is contended it should have been received, as showing that Mary Evans, and not the plaintiff, was the lawful widow of Thomas D. Jones, and that the facts of this case distinguish it from Conant v. Griffin, 48 Ill. 410, where there was an attempt to show that another one than the plaintiff there was the true widow of deceased, and it was held that which one was the true widow was immaterial; that that fact would only become important when the administrator was called upon to make distribution. It is claimed that here it is important which one is the true widow, as Mary Evans, by her conduct, had absolved the deceased from any legal liability for her support, and that she had sustained no pecuniary injury by his death. However this may be, we think the

evidence was properly excluded, as not showing the invalidity of the second marriage of Jones. The second marriage being shown in fact, the law raises a strong presumption in favor of its legality, which we do not regard as overcome by mere proof of a prior marriage, and that the first wife had not obtained a divorce. [See Johnson v. Johnson, 114 Ill. 617, 3 N. E. 232.] The husband might have obtained such divorce, and left him free to contract the second marriage.'

"In Johnson v. Johnson, 114 Ill. 617, cited in the foregoing case, the court, per SHOPE, J., said: 'But if the law raises the presumption that the former husband was alive at the date of the last marriage, from the fact that seven years had not then elapsed since the last knowledge of him, it also, in the absence of proof to the contrary, presumes that the parties, in contracting such marriage, and in subsequently cohabiting, were innocent of immorality or crime, and that there was no legal impediment to its consummation. When a marriage is shown in fact, the law raises a strong presumption in favor of its legality, and the burden is with the party objecting to its validity to prove that it is not valid. [Bish. Mar. & Div., secs. 457, 458.] Presumptions of this class are not conclusive, but are sufficient, in general, to shift the burden of proof. [1 Greenleaf Ev., secs. 33-35.] These presumptions of innocence, and of the validity of the marriage, conflict with the presumption of life; and if neither presumption is aided by proof of facts or circumstances co-operating with it, the presumption of the validity of the marriage has generally been held to be the stronger, and to prevail over the presumption of the continuance of the particular life; and this is so held although the time elapsing between the last knowledge of the former husband and the second marriage is much less than seven years.'

"As to the burden of proof the doctrine is thus announced in 19 Am. and Eng. Ency. Law (2 Ed.).

1209: 'As a result of the doctrine that all presumptions are in favor of marriage, the invalidity of a marriage cannot be established like any other question of fact, as every presumption must be overcome by satisfactory proof. The burden of proof is always on the party attacking the validity of the marriage.' And further, upon the same page, the author says: 'The party having the burden of proof must overcome every presumption in favor of the marriage alleged to be invalid, even though this may require the proof of a negative.'

"On the question of burden of proof, even though it require the proof of a negative, the Supreme Court of the United States through Justice WAYNE, in the case of Patterson v. Gaines et ux., 6 How. l. c. 598, says: 'But there is no force in this objection for another reason. When, in the progress of a suit in equity, a question of pedigree arises, and there is proof enough, in the opinion of the court, to establish the marriage of the ancestor, the presumption of law is, that a child of the marriage is legitimate, and it will be incumbent upon him who denies it to disprove it, though in doing so he may have to prove a negative.'

"In cases of the character involved in this record, the following cases declare in favor of the presumption of divorce, although there may be evidence of a former valid marriage: Johnson v. Johnson, 114 Ill. 611; Boulden v. McIntire, 119 Ind. 574; Blanchard v. Lambert, 43 Iowa 228; In re Edwards, 58 Iowa 431; Leach v. Hall, 95 Iowa 611; Parsons v. Grand Lodge, 108 Iowa 6; Hull v. Rawls, 27 Miss. 471; Klein v. Laudman, 29 Mo. 259; Hadley v. Rash, 21 Mont. 259; Carroll v. Carroll, 20 Tex. 731; Coal Run Coal Co. v. Jones, 127 Ill. 379; Harris v. Harris, 8 Ill. App. 57; Cartwright v. McGown, 121 Ill. 388.

"Along the same line, in Hynes v. McDermott, 91 N. Y. l. c. 459, 43 Am. Rep. 677, it is said: 'The

law presumes morality, and not immorality; marriage, and not concubinage; legitimacy and not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence.'

"And Lord LYNDHURST, in Morris v. Daviss, 5 Clark & F. 163, says: 'The presumption of law (the presumption of the validity of a marriage shown) is not lightly to be repelled. It is not to be broken in upon or shaken by a mere balance of probability. The evidence for the purpose of repelling it must be strong, distinct, satisfactory and conclusive.'

"And Lord CAMPBELL said in Piers v. Piers, 2 H. L. Cas. 331, it could only be negatived 'by proving every reasonable possibility.'

"In Harris v. Harris, 8 Ill. App. l. c. 63, the court says: 'When it is shown that a marriage has been consummated in accordance with the forms of the law, it is to be presumed that no legal impediments existed to their entering into matrimonial relations, and the fact, if shown, that either or both of the parties have been previously married, and, of course, at a former time having a husband or wife living, does not destroy the prima-facie legality of the last marriage. The natural inference in such case is, that the former marriage has been legally dissolved, and the burden of showing that it had not been rests upon the party seeking to impeach the last marriage. The law does not impose upon every person contracting a second marriage the necessity of preserving evidence that the former marriage has been dissolved, either by the death of their former consort or by a decree of court, in order to protect themselves against a bill for a divorce or a prosecution for bigamy.'

"Along the same line fall the cases of Yates v. Houston, 3 Tex. 433; Dixon v. People, 18 Mich. 84; Greensborough v. Underhill, 12 Vt. 604.

"On the other hand, there are cases against this proposition, such as Williams v. Williams, 63 Wis. 58; Rhode Island Hospital Trust Co. v. Thorndike, 24 R. I. 105; Wilson v. Allen, 108 Ga. 275. Several others are cited, but are not exactly in point.

"At the argument of this cause, we are frank to state that upon this instruction number 4, we were of the opinion that the trial court was in error. But an examination of the authorities has convinced us to the contrary.

"Under the weight of authority, the second marriage, when shown to have been legally entered into, that is, in due form of law, is clothed with every presumption of validity. Such is the doctrine announced by Bishop. If its validity is attacked, the burden of proving the invalidity is upon the party attacking it. And if in assuming this burden, which the law demands, it becomes necessary to prove a negative, he must do so. The law presumes death after seven years, why not presume divorce? The courts seem to look upon the presumption of innocence as the stronger and greater presumption, and in order to sustain the presumption of innocence, will indulge the presumption of divorce, rather than find the party guilty of bigamy. To say the least, the weight of judicial opinion places with the party attacking the burden of proving the invalidity of the second marriage. This is all the instruction required.

"Again, the facts of the case are not specially inviting to a strained construction. The first wife for nearly ten years was living with another man, by whom she evidently had two children. She settled with defendants for $100, and hardly thought she was entitled to that sum. She made no claim to more and upon the receipt of the $100 agreed to and did testify. It is true that upon hearing of the death of Johnson a year afterwards, she married the man with whom

she had been living for ten years, using the $100 paid her by defendants for that purpose.

"But without going into further detail we are of the opinion that there was no error upon the part of the trial court in giving said instruction. The presumption of innocence, which is stronger than all counter presumptions in such cases, casts the burden of proof upon the party denying the validity of the marriage, even to the extent of proving a negative. This in no way conflicts with the recent case of Snuffer v. Karr, 197 Mo. 182, for the reason that in the Snuffer Case it was an admitted fact that there had been no dissolution of the first marriage. The case was so argued and so presented. The validity of the first marriage was attacked, but if found to be valid, its non-dissolution was a conceded point. This being true, there was no place for presumption of divorce."

Counsel for appellant do not question the correctness or wisdom of the rule of evidence discussed and indorsed by Judge GRAVES in the Johnson Case, but insist that "the presumption of a valid marriage springing from the proof of the three marriage ceremonies performed in America is rebutted by the proof that the marriage with the plaintiff, Barbara Maier, is valid, that Barbara Maier was still living and had been true to her marital vows, and that the first marriage had not been dissolved in the jurisdiction where she lived." In support of their contention they cite and rely upon the following authorities: 8 Enc. Evidence, p. 464; Cole v. Cole, 153 Ill. 585; Gilman v. Sheets, 78 Iowa 499; Barnes v. Barnes, 90 Iowa 282; Ellis v. Ellis, 58 Iowa 720; Williams v. Williams, 63 Wis. 58; Note to Pittinger v. Pittinger, 89 Am. St. Rep. 202-206; and Casley v. Mitchell, 121 Iowa 96.

The principal, if not the only, authority cited by counsel for appellant which lends special force to their contention, and which it is contended distinguished it from the Johnson Case, supra, is the case

of Casley v. Mitchell, supra. In that case, the court uses the following language:

"That the John Casley who was married to the plaintiff in 1863, is the identical person who became the owner of the property in question under the assumed name of John Wallace, does not admit of doubt and indeed is not seriously questioned.

"Some four years after his marriage to the plaintiff, John Casley left his wife at St. Just, England, for the purpose of seeking employment elsewhere. For some three months thereafter the plaintiff received letters and remittances from him, but thereafter heard nothing from him and for many years did not know his whereabouts.

"John Casley went to Germany from England after he abandoned the plaintiff and there he assumed the name of John Wallace, and was married under that name in 1873. After his second marriage he removed to the northern part of England, where he and his new wife, Elizabeth Wallace, lived eight or ten months, and from there they came to the United States and located first in Pennsylvania. In 1875 he came to Iowa, and the year after his second wife joined him here. In 1877, they removed to Colorado where they resided about a year and from there they came back to Iowa, where they lived together as husband and wife until the death of Casley, in 1898. During all of this time he went under the assumed name of John Wallace and acquired and held property in that name.

"There is no evidence in the record tending to show that he had at any time or place procured a divorce from the plaintiff. She did not procure one from him nor did she ever have any knowledge or notice that he had procured or attempted to procure any divorce from her. Neither did the plaintiff have knowledge that Casley had again married.

"No presumption that Casley had obtained a divorce from the plaintiff before or after his marriage in Germany can be indulged in and the case of Blanchard v. Lambert, 43 Iowa 228, and later cases based upon facts similar thereto are not controlling here. . . . This case is clearly within the rule announced in Ellis v. Ellis, 58 Iowa 720, where it is said: 'There must be something based on the acts and conduct of both parties inconsistent with the continuance of the marriage relation before the presumption should be indulged.'

"No presumption that a divorce was obtained by Casley should obtain in this case. But, even if such presumption might reasonably be indulged in, it would be fully overcome by the fact that he deserted his former wife without any cause whatever, and that he thereafter married and lived far from her under a false name."

The Iowa court seems to have laid much stress upon the fact that Casley, when he left England and came to this country, changed his name to Wallace, and was married in this country under that name. But we do not attach much importance to the alleged change of name in the case at bar, for the reason that there was no change made in fact. After coming to this country he retained the same name, but spelled it "Joseph Meyer" instead of Josef Maier. The former is the way many, if not most, Englishmen and Americans of that name spell it; and it was perfectly naturally for him, after coming to this country to make it his home and after becoming associated with Americans, to write his name in English, and when so writing it to write it Joseph Meyer instead of Josef Maier. How else would he have written it—Myer, or one of the various other ways it is spelt in English? But had he done so, the same sinister motive could and doubtless would have been charged against him for so doing. The mere fact that he used one of the English ways

of spelling his name after coming to this country signifies that he had no secret or sinister motive for so doing, for the reason that such change in spelling was in fact no change of name in reality. Inquiry here for him would not have been hindered in the least by that change of spelling, and he could have been identified just as readily after changing the spelling of his name as he could have been prior to that time, which fact is shown by the ease with which appellant identified him in this case. But it is said he added the initial "G" to his name also after coming to this country. Why that was done the evidence does not show. Appellant testified that "according to all she knew he had only one surname. Why he put the 'G' after Josef I do not know." She did not say positively that he had no other surname, and said nothing whatever regarding his middle Christian name.

She testified that she first became "acquainted with Josef Maier in 1865 . . . and married him January 24, 1865," consequently she knew him only a few days before they were married. She also testified that "my husband went to America in the spring of 1866," and she fails to state any other knowledge or information she had of him or his family. So from her own testimony she knew him but a little over one year prior to his departure for America, and that was more than forty years before she gave her testimony in this case; and it was for that reason doubtless she did not wish to state positively that he had no other Christian name besides Josef.

Under all of the decisions of this court, had Joseph G. Meyer procured service upon appellant, in his divorce case by publication, under names as above written, that service would have been valid, for names are *idem sonans* if the attentive ear finds difficulty in distinguishing them when pronounced, or common and long continued usage has by corruption or ab-

breviation made them identical in pronunciation. And it is not necessary that they should be spelled alike if the pronunciation is the same. [Simonson v. Dolan, 114 Mo. 176; Green v. Meyers, 98 Mo. App. 438.]

So, if we apply the rule of evidence announced by Judge GRAVES in the Johnson Case to the facts of this, then we have a much stronger presumption in favor of Meyer's divorce than we had in that case, for the reason that this is strongly corroborated by the facts, that prior to his coming to this State he had resided elsewhere in this country, for some eight or ten years, during which time he could have and presumably did secure a divorce from appellant, for the reason that he brought with him to Carthage a woman to whom he claimed to have been married, and he introduced her to his neighbors as his wife. And, after taking up his residence in Jasper county, he was married three additional times to as many different women after his marital relations with each had been severed by death or divorce; and after having married at least twice in this country, he returned to his old home in Germany, where appellant, his first wife, and his daughter by her resided. They called upon him, but this record fails to disclose the character of the conversation which took place between him and appellant. It does show, however, that by persuasion he induced his daughter to agree to return with him to this country and live with him; but subsequently she changed her mind and declined to accompany him. So he returned to Carthage alone, and there resided upon the land in controversy with his various wives up to the date of his death. Presumably appellant and her daughter knew Meyer was residing at Carthage, otherwise the latter would not in all probability have agreed to come to this country without knowing the place of her destination. If he had not, in fact, been divorced from appellant at the time he visited her, in 1885, at her old home, then he was a

bigamist, a criminal, and guilty of an offense punishable by imprisonment in the penitentiary. If that was true, surely he would not have made himself known to them, the persons against whom he had greatly sinned, and who, more likely than any one else, would have called him to an accounting for his misdeeds; and much less would he have insisted upon his daughter returning to this country and living with him, if he was then a felon, for the reason that her coming alone would have revealed his crime and subjected him to prosecution, imprisonment and infamy, and would also thereby have heaped shame and humiliation upon her and his wife and children in this country.

Besides this, the life he lived for thirty years at Carthage bespeaks much in his favor, and contradicts the idea that he was leading the life of a criminal and bringing into existence illegitimate children. He was very poor when he came to this country; he did not have the means with which to bring appellant with him, so she testified. But after he came to this State, he lived the life of an industrious, hard-working man; and by economy and frugality he accumulated sufficient means with which to purchase the farm in question, and provided a home for himself, wife and children. He was an honest, respected citizen, and reared and educated an intelligent, respectable family. All of these things are not in keeping with the conduct and life of a criminal, but, upon the contrary, strongly corroborate the wise and humane presumption that he was legally divorced from appellant prior to his coming to this State and prior to his first marriage in this country.

It is upon this alleged change of name, coupled with the evidence of appellant's good character, that counsel base their insistence that the presumption indulged in favor of the divorce and the validity of Meyer's subsequent marriages is overcome, and leaves the preponderance of the evidence upon the side of

appellant. We cannot lend our concurrence to that contention, for the reason that there was no change of name in fact shown by the evidence, as was done in the Iowa case, where the name was changed from Casley to Wallace. In the latter case the change was complete and was evidently made for a fraudulent purpose; while in this there was no fraud shown, nor could any sinister motive be reasonably drawn from the change made in the spelling of his name; but, upon the contrary, the facts of the case indicate that the change in spelling the name in this case was reasonable and natural. And as regards appellant's good reputation, it may be said that this record fails to show that hers was any better than his was, except as to such unfavorable inference as may be drawn from the mere fact that he left her so shortly after their marriage. Why he abandoned her he could not tell, because his lips are closed by the seal of death, and hers by voluntary silence. She only said Meyer did not want her to go to America with him, but she did not explain why he did not want her to accompany him. He evidently had some reason for not wanting her to come, and, presumably, she knew that reason; and since she declined to testify upon that question, we would not attach too much importance to the fact that he left her behind.

As has been repeatedly stated in the adjudged cases and written by law-writers of eminence, "The law presumes morality, not immorality; marriage, not concubinage; legitimacy, not bastardy." The consensus of opinion is that whenever a marriage has been shown the law indulges the presumption that it is valid, and the burden is cast upon those who question its validity to show its invalidity by strong and persuasive evidence, leaving no room for reasonable doubt in the mind of the chancellor. And as has been said, "This is a presumption of more than ordinary strength. It is one of the strongest known to the

law.'' [Pittinger v. Pittinger (Colo.), 89 Am. St. Rep. 193, and exhaustive note on the subject; Lampkin v. Traveler's Ins. Co., 11 Colo. App. 249; 2 Nelson on Divorce and Separation, sec. 580; Teter v. Teter, 191 Ind. 129; Johnson v. Johnson, 114 Ill. 611; Erwin v. English, 61 Conn. 502; U. S. v. DeAmador (N. M.), 27 Pac. 488.]

To lend our concurrence to the contention of counsel for appellant would be equivalent to holding Meyer was a bigamist and had lived the life of a criminal for thirty years in our midst; that his wives were concubines and his children bastards. Such a thought is abhorrent to all law and repulsive to every sense of right and justice, and no court would be justified in so holding, except where the evidence in a case should show such facts to be true beyond a reasonable doubt. Christian marriage is the very foundation upon which the family and home are based, and upon them the State and the Republic rest; and without marriage and its legal maintenance the family circle would be dissolved, the home extinguished, and the State would become useless and the Republic would decline; and in lieu thereof immorality, chaos and anarchy would reign supreme.

This view of the case renders it unnecessary for us to pass upon the question as to whether or not an alien is dowable in lands situate in this State, owned by her husband at the time of his death, who was also an alien.

We are, therefore, of the opinion that the trial was without error, that the judgment was for the proper parties, and that it should be affirmed. It is so ordered.

All concur.