PETRA CRUZ QUIÑONES ET AL., Plaintiffs and Appellees, *v.* VICENTA RAMOS ET AL., ETC., Defendants and Appellants.

No. 9718. Argued December 21, 1948.—Decided December 20, 1949.

*Faustino R. Aponte* for appellants. *Benjamín Ortiz* and *Alvaro Ortiz* for appellees.

MR. JUSTICE NEGRÓN FERNÁNDEZ delivered the opinion of the Court.

On October 17, 1892, Francisco P. Cruz, of 19 years of age, and Gregoria Quiñones, of 14, contracted canonical marriage in the island of Vieques. Two children were born of the marriage: Petra, on January 14, 1895, and Anastacio, on July 12, 1896. Anastacio died on October 8, 1927, while married to Virginia López, leaving three sons named Osvaldo, Edmundo Aníbal, and Rogelio.

Gregoria Quiñones disappeared from Vieques about four years after the marriage, at some unknown date, and nothing was ever heard of her again.

Declaring his civil status to be that of a widower, Francisco Cruz contracted civil marriage with Mariana Ramos in the town of Río Grande on October 27, 1900. Of this second marriage eight children were born: Guillermina, Vicenta, Irene, Julia, Justino, Basilio, Eugenia, and Angel Rafael, and property was acquired.

Mariana Ramos died in the town of Fajardo on August 8, 1928. On June 15, 1929, the District Court of Humacao, in a proceeding of declaration of heirship filed by Francisco Cruz, declared the eight children mentioned above sole and universal heirs of Mariana Ramos, and recognized Cruz's right to the usufructuary share fixed by law. On June 30, 1936, the District Court of Humacao, in a proceeding filed by Francisco Cruz and Juan Aromí, the latter as guardian *ad litem* of three of the eight heirs of Mariana Ramos— minors—approved the deed of partition executed by reason of the death of the afore-mentioned predecessor. In this partition Francisco Cruz waived his usufructuary share in

favor of the eight heirs of Mariana Ramos who were adjudicated half of the property which belonged to the decedent at the liquidation of the conjugal partnership. The declaration of heirship as well as the deed of partition were recorded in the registry of property.

Francisco Cruz died on March 16, 1939, while married to María Martínez, his third wife. This marriage took place in Luquillo on August 16, 1934.

On March 23, 1945, Petra Cruz Quiñones, daughter of Francisco Cruz and Gregoria Quiñones, and the children of her deceased brother, Anastacio, filed, as heirs of Cruz, a civil action to annul the second marriage of the latter—contracted with Mariana Ramos on October 27, 1900—as well as the third—contracted with María Martínez on August 16, 1934—and, hence, to annul the registration made in the civil registry of the eight children of the second marriage, who had been registered as legitimate; the judicial proceedings brought in the District Court of Humacao, as well as the records made in the registry of property; to recover the property adjudicated to the eight children at the death of Mariana Ramos in 1928 as her conjugal share in the property acquired during the marriage, and to obtain damages.

As a ground for the annulment of the second and third marriages, it was alleged that at the time they took place Cruz was still married to Gregoria Quiñones, without said marriage having been dissolved.

In their answer defendants admitted some of the facts alleged in the complaint and denied others setting up, in addition, several special defenses. After a trial on its merits, the lower court rendered judgment for plaintiffs. It declared void the marriage of Francisco P. Cruz and Mariana Ramos contracted on October 27, 1900, as well as the marriage contracted with María Martínez on August 16, 1934; it declared that the eight children born of the marriage with

Mariana Ramos were adulterine, but entitled them to use the surname of their parents; that the deed of partition and adjudication of property as well as all the entries made in the registry of property by virtue of said partition were also void; that the only persons having a right to the property described in the complaint were the plaintiff Petra Cruz Quiñones and the children of the late Anastacio Cruz Quiñones, named Rogelio, Osvaldo, and Angel [1] Cruz López, as those persons were the sole and universal heirs of Francisco P. Cruz, and it adjudged that defendants pay to the plaintiffs as damages the sum of $1,000 for the possession and enjoyment of the property left by Francisco P. Cruz at his death, plus costs and $300 for attorneys' fees.

On appeal defendants have assigned seven errors. Although in the lower court they raised, among others, the special defense that plaintiffs lacked legal capacity to sue, which was decided adversely to them, on appeal they have abandoned this defense for which reason we need not pass on it.

■■ Although seventh in the order of assignment, we shall first consider the error by which it is alleged that the cause of action had prescribed.

The Spanish Civil Code, in force at the time of the marriage of Francisco Cruz and Gregoria Quiñones—1892—as well as at the time of his marriage with Mariana Ramos—1900—provided in its § 83 that, among others, "Any person already married" could not contract marriage; and in § 101 that among others, marriages "entered into by the persons mentioned in Articles 83 and 84, except in cases of dispensation," were void. The incapacity on which the action for nullity is based in the instant case—a former marriage—is considered as an absolute impediment. 1 Manresa, *Comen-*

---

[1] Although the judgment refers to Rogelio, Osvaldo, and Angel Cruz López, the evidence showed that the names of the three sons of Anastacio Cruz Quiñones are Rogelio, Osvaldo, and Edmundo Aníbal.

*tarios al Código Civil,* 1923 ed., pp. 439 and 446; 2 Scaevola, Civil Code, p. 288. The action is predicated on the theory that the second marriage is void *ab initio* that is, nonexistent, and not merely voidable. This being so, the action for its nullity does not prescribe.

In *Just* v. *Just et al.,* 32 P.R.R. 229, this Court stated the difference between a marriage void *ab initio* and one merely voidable. The distinction was also established in *Cintrón* v. *Román,* 36 P.R.R. 437, and in *Rodríguez* v. *Díaz,* 65 P.R.R. 266. Although in none of these cases the validity of the marriage was challenged on the ground of a former marriage, the principles established serve as a basis for the conclusion that when a marriage is contracted and it has not been dissolved at the time of the second marriage, the incapacity of the spouses of the first marriage is absolute and the second marriage is void *ab initio* and nonexistent. 1 Manresa, *op.* and pp. *cit.;* 2 Scaevola, Civil Code, pp. 288 and 293. Therefore, since a marriage contracted under the incapacity of a previous marriage is void *ab initio* and nonexistent, the defense of prescription is untenable, as, like in any other nonexistent contract there is no starting point to compute the time of prescription. *González et al.* v. *Fumero et al.,* 38 P.R.R. 497; *Costas* v. *G. Llinás & Co.,* 66 P.R.R. 688; *Gastambide* v. *Heirs of Ortiz, ante,* p. 388; *Succession of Gabisso* (1907), La. 44 So. 438.

■■ The second assignment of error is to the effect that the judgment is contrary to the law and the evidence.

We have before us an action for the annulment of a marriage contracted at the time when the Spanish Civil Code was in force—that of Francisco Cruz with Mariana Ramos in 1900—and of another marriage contracted while our Civil Code was in force—that of Francisco Cruz with María Martínez in 1934.

We have already pointed out that § 101 of the Spanish Civil Code declared void, among others, marriages contracted

by persons who at the time of entering into them were already married (§ 83, subd. 5, Sp. Civ. Code). Section 51 of the same Code provided: "Civil or canonical marriage shall not produce any civil effects when either of the spouses is already legally married." On the other hand, § 69 of the same Code provided, in turn: "A marriage contracted in good faith produces civil effects, although it may be declared void"; the same Section continued: "If good faith existed on the part of only one of the spouses it shall produce civil effects only with regard to such spouse and the children." "Good faith is presumed if the contrary is not shown" and, finally, "When bad faith has existed on the part of both spouses, the marriage shall produce civil effects only with relation to the children."

Manresa, commenting on § 51 of the Spanish Civil Code, says:

"Since polygamy and polyandry are absolutely condemned as contrary to the essence of marriage, and the bond of matrimony being an absolute impediment according to canon law, it is obviously clear that a marriage contracted by a person who is united to another by a marriage bond not legally dissolved, is void pursuant to paragraph 5 of article 83 of this Code and art. 486 of the Penal Code that punishes bigamy. A marriage thus contracted lacks the necessary elements to render it valid and effective, and according to the language of this article it cannot produce civil effects.

"It should be observed that under art. 69 a marriage contracted in good faith produces civil effects, although it may be declared void, and even when bad faith existed on the part of both spouses, it produces civil effects with regard to the children.

"There is no contradiction in both texts. The first states the general rule and the second establishes the exception of which the spouse who has acted in good faith and the children may avail themselves in order to obtain the recognition of their right in conformance with the abnormal situation.

"Consequently, when a marriage contracted in good faith by a person is annulled because the other party was previously legally married, the provisions of Article 51 are not applicable

to the offspring and the innocent spouse, but instead those of article 69 control, which is very special and expressly enacted to cover the case." 1 Manresa, *Comentarios al Código Civil Español*, 1924 ed., pp. 312 and 313.

And commenting on § 69 of the same Code, he says:

"The civil effects recognized by the Code spring at the time of the marriage notwithstanding that shortly thereafter one of the spouses may learn of the legal prohibition or impediment, for it suffices that good faith existed at the very moment of the ceremony. The rule has no exception and the fiction of law has in this case very deep roots based on the factors indicated above, favoring the legitimacy of the offspring.

"Marriage will be deemed to exist in the public mind within the relationship created by social contact and in the everyday intercourse with friends and relatives until a judicial decision decreeing its nullity is known (usually by its effects). This is not the first time that a consummated act successfully calls for the initiative and sanction of the lawmaker.

"The concept of legitimacy shall certainly embrace the children whom the marriage legitimates, as the civil effects thereof are derived from its being entered into, and any child who is born during the 301 days following the legal separation of the spouses shall also enjoy it. This proposition has its basis on article 69 which is being discussed and paragraph 2 of article 45." 1 Manresa, *Comentarios al Código Civil Español*, 1924 ed., pp. 378 and 379.

There is nothing in the record to overcome, with respect to both spouses—Francisco Cruz or Mariana Ramos—the presumption of good faith with which the statute favored them at the time they married in 1900.[2]

---

[2] Although under such circumstances defendants did not need to present evidence to show good faith on their part, nevertheless, they offered evidence—which was not admitted—tending to show that Cruz had made statements, before his marriage to Mariana Ramos, to the effect that Gregoria Quiñones, his first wife, had died because "he had received a mourning letter."

Pursuant to paragraph 4 of § 397 of the Code of Civil Procedure—§ 35 of the Law of Evidence (§ 1870, Cal. Code of Civ. Proc.)—"the act or declaration, verbal or written, of a person deceased. . . in respect to the

On the other hand, § 72 of the Spanish Civil Code provided that "The final decree of annullment of marriages shall produce *the same effects* with regard to the property of the parties *as a dissolution of marriage by death, provided*, that the spouse who has acted in bad faith shall have no right to participate in the profits of the conjugal partnership." (Italics ours.) Manresa, commenting on this article, says:

"The effects of annulment of marriage with regard to the rights granted by law to the spouses in each case have been determined; likewise, the duties with regard to the children as well as their disposition; we need only regulate now the manner of liquidating a dissolved conjugal partnership.

".      .      .      .      .      .      .      .      .      .

"After the decree of annulment is final, all appearance of validity of the ceremonial marriage is overcome. At the time of enforcing the decree, donations by reason of marriage are treated the same as in the case of dissolution by death, pursuant to § 72, with the variations to which we have referred above, enumerated in paragraph 3 of § 73, read together with § 1333, and without detriment, in the proper case, to the provisions of § 1440, which shows that they are not always rendered ineffective, that is, that even though a void marriage is involved, the law does not wish to be so strict as to consider that the marriage never existed, for it rewards the good faith of a spouse by treating him or her as the surviving spouse. The dowry is returned together with the paraphernal property, whenever its restitution is proper (see art. 1365), for under subd. 3 of art. 73 there are also certain limitations *and the community property, if any, is divided share and share alike, if both spouses acted in good faith, but if only one acted in good faith, then he or she may retain the whole of it.*" (Italics ours.) 1 Manresa, *Comentarios al Código Civil Español*, 1924 ed., pp. 381 and 382.

---

pedigree, birth, parentage, age, marriage, *death*, or relationship, of any person related by blood or marriage to such person. . ." may be introduced in evidence at any trial. (Italics ours.) This evidence, therefore, was admissible, irrespective of the weight that may have been given to it. *In re Smith's Estate*, 33 C. 2d 279, 201 P. 2d. 539; *In re Estate of Morgan*, 203 Cal. 569, 265 P. 241; *In re Estate of Friedman*, 178 Cal. 127, 172 P. 140.

The fifth assignment of error is based on the refusal of the lower court to admit said evidence.

Applying, therefore, to this state of facts the provisions of the statute governing at the time of the marriage of Francisco Cruz to Mariana Ramos, we would reach the inescapable conclusion that even on the assumption that the lower court would have been justified on the evidence introduced, in declaring the marriage void, it was not justified in denying civil effects to the marriage by holding, as it did, that the eight children born during the marriage were adulterine, and that the share of the property alloted to the eight children by inheritance of half of the community property belonging to their mother Mariana Ramos,[3] belonged to the plaintiffs as heirs of Francisco Cruz.

However, the evidence introduced in the lower court does not warrant its conclusion declaring void the second and third marriages of Francisco Cruz. Plaintiffs established, by the certificate of Cruz's first marriage, that said first marriage had taken place, but they did not offer any other evidence to show that it was still in force at the time of the second—1900 —and of the third—1934. Evidently, in order to prove the nullity of the subsequent marriages, they relied, after establishing the first marriage, on the presumption of its continuance, pursuant to § 102 of the Law of Evidence, subd. 31[4] and on that of the continuance of life of the first wife. But this is not enough in cases of this nature. The general rule is that in order to obtain a decree of annulment of marriage on the ground that when the latter was contracted one of the spouses was incapacitated to marry by reason of a prior marriage, it is not only necessary to prove the contracting of the prior marriage, but also that said marriage, at the time of

---

[3] The inheritance of Francisco Cruz, deceased in 1939, was not contested in this suit. Only the one-half that belonged to his second wife, Mariana Ramos, and which, by inheritance, went to the defendants, is claimed in this action.

[4] Section 102 of our Law of Evidence (464, subd. 31 of the Code of Civil Procedure, 1933 ed.) provides: "That a thing once proved to exist continues as long as is usual with things of that nature."

the second, had continued in force and had not terminated by the death of the absent spouse or by a decree of divorce or annulment.[5] This rule has its basis in public policy which establishes one of the strongest presumptions in favor of a subsequent marriage; [6] and, consequently, the presumption in favor of the legality of a marriage when a man and a woman act as husband and wife and that they are innocent of the crime of bigamy prevails over the presumption which favors the continuance in force of a prior marriage.[7] This being so, in the instant case plaintiffs had the burden to prove that the first marriage of Francisco Cruz had not terminated by death at the time of the second marriage with Mariana Ramos, and that it had not been annuled. That it had not terminated by

[5] *Patterson* v. *Gaines et ux.* (1848), 47 U. S. 550, 12 L. Ed. 553; *Moran* v. *Superior Court* (1940), 38 Cal. App. 2d 328, 100 P. 2d 1096; *In re Smith's Estate*, 201 P. 2d 539 (Calif., 1949); *Hamburg* v. *Hays* (1937), 22 Cal. App. 2d 508, 71 P. 2d 301; *Estate of Newman* (1939), 34 Cal. App. 2d 706, 94 P. 2d 356; *Immel* v. *Dowd* (1935), 6 Cal. App. 2d 145, 44 P. 2d 373; *Estate of Chandler* (1931), 113 Cal. App. 630; *Everett* v. *Standard Acc. Ins. Co.* (1919), 45 Cal. App. 332, 187 P. 996; *Wilcox* v. *Wilcox* (1916), 171 Cal. 770, 155 P. 95; *Estate of Hughson* (1916), 173 Cal. 448; *In re Pussey's Estate* (1916), 173 Cal. 141, 159 P. 433; *Hale* v. *Hale* (1913), 40 Okl. 101, 135 P. 1143; *Chancy* v. *Whinnery* (1915), 47 Okl. 272, 147 P. 1036; *Brotherhood of Railroad Trainmen* v. *Merideth*, 225 S.W. 337 (Ark., 1920); *Estes* v. *Merrill*, 181 S.W. 136 (Ark., 1915); *McGaugh* v. *Mathis*, 198 S.W. 1147 (Ark., 1917); *Templeton* v. *Jones*, 259 P. 543 (Okla., 1927); *Kelsey* v. *Miller* (1928), 203 Cal. 61; *Erwin* v. *English*, 23 A. 753 (Conn., 1892); *Marsh* v. *Marsh* (1926), 79 Cal. App. 560; *Griggs* v. *Pullman Co.*, 40 S.W. 2d. 463 (Mo., 1931); Nelson, Divorce and Annulment, 2d· ed., Vol. 3, p. 351; Annotation, 34 A.L.R. 464, and cited cases; Annotation, 77 A.L.R. 730, and cases cited; 35 Am. Jur., §§ 206, 217, *et seq.;* cf. *Schmisseur* v. *Beatrie*, 35 N. E. 525 (Ill., 1893); *Ryder* v. *Ryder* (1934), 2 Cal. App. 2d 426, 37 P. 2d 1069.

[6] *Doertch* v. *Folwell Engineering Co.* (1930), 252 Mich. 76, 233 N. W. 211; *Marsh* v. *Marsh* (1926), 79 Cal. App.· 560; *Griggs* v. *Pullman Co.*, 40 S. W. 2d 463 (Mo., 1931); *Maier* v. *Brock*, 120 S. W. 1167 (Mo., 1909).

[7] *Doertch* v. *Folwell Engineering Co.* (1930), 252 Mich. 76, 233 N. W. 211; *Walker* v. *Walker*, 117 So. 472 (Ala., 1928); *Sparks* v. *Ross*, 65 A. 977 (N. J., 1907); *Pittinger* v. *Pittinger* (1901), 28 Colo. 308, 64 P. 195; *Tompkins* v. *Commonwealth*, 77 S. W. 712 (Ky., 1903); *Lathan* v. *Lathan*, 1 S.W. 2d 67 (Ark., 1928); *Templeton* v. *Jones*, 259 P. 543 (Okla., 1927); *Marsh* v. *Marsh* (1926), 79 Cal. App. 560; *Hunter* v.·*Hunter* (1896), 111 Cal. 261, 43 P. 756; 26· California Law Review 270.

death, because, as we have seen, the presumption of continuance of life is controverted in cases of this sort by the stronger presumption of validity of the second marriage. That it had not been dissolved by annulment, because although under § 52 of the Spanish Civil Code the only ground for dissolution of marriage was the death of one of the spouses, the Code based its provision on the juridical fact that a void marriage cannot be dissolved and that the decree of annulment merely declares that it has never existed. 2 Scaevola, Civil Code, p. 111. Therefore, in order to overcome the presumption of validity which attached to said marriage, even though the Spanish Civil Code only recognized death as the sole ground for its *dissolution*, it was also necessary to prove that it had not been declared void. As to the challenge to the third marriage of Francisco Cruz, contracted while our Civil Code was in force, it was also necessary to prove that the first marriage had not been dissolved by divorce.[8]

Since plaintiffs' evidence was not sufficient to justify the annulment of the second marriage of Francisco Cruz—with Mariana Ramos in 1900—nor the third—with María Martínez in 1934—the lower court committed error in declaring them void. Consequently, the judgment rendered by the District Court of Humacao on February 25, 1947 in this case will be reversed and the complaint will be dismissed with costs on the plaintiffs.

---

[8] Although under § 104 of the Spanish Civil Code divorce only produced a separation of the spouses pursuant to § 95 of our Code, 1930 ed., divorce is one of the means of dissolution of marriage.